PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

BENJAMIN NELSON HOLMES,
  *Defendant-Appellant.*

No. 02-4871

Appeal from the United States District Court
for the District of South Carolina, at Florence.
C. Weston Houck, Senior District Judge.
(CR-01-121)

Argued: May 7, 2004

Decided: July 21, 2004

Before WILKINSON, LUTTIG, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge Luttig wrote the opinion, in which Judge Wilkinson and Judge Shedd joined.

## COUNSEL

**ARGUED:** Joshua Snow Kendrick, DEBRA CHAPMAN, P.A., Columbia, South Carolina, for Appellant. Thomas Ernest Booth, Criminal Division, Appellate Section, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Debra Y. Chapman, Columbia, South Carolina, for Appellant. J. Strom Thurmond, Jr., United States Attorney, Columbia, South Carolina, Alfred W. Bethea, Jr., Assistant United States Attorney, Florence, South Carolina, for Appellee.

**OPINION**

LUTTIG, Circuit Judge:

Appellant, Benjamin Holmes, was convicted by a jury on two felony counts of being a felon in possession of a weapon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). The evidence at trial demonstrated that Holmes, who had prior felony convictions, unlawfully possessed a firearm on two separate dates in 2000. Holmes' primary claim on appeal is that the district court erred in concluding that, under *Michigan* v. *Long*, 463 U.S. 1032 (1983), the January 2000 protective search of his vehicle for weapons was reasonable under the Fourth Amendment and, as a consequence, in denying his motion to suppress the pistol and corresponding ammunition that the search uncovered. We affirm.

I.

A.

In the late 1990s, South Carolina Law Enforcement Division ("SLED") agents were investigating a series of armed robberies of drug dealers in the state. Informants had provided SLED agents with the aliases for at least three of the suspected robbers: "Six," "Troop," and "Turbo," and warrants were issued for their arrest. SLED had correctly identified Leroy Blanding as "Turbo" and Terry Pressly as "Troop," but incorrectly believed that Calvin Pearson was "Six." In reality, Pearson went by the name of "Slim"; "Six" was actually the appellant, Holmes. Consistent with this mistaken identification, the warrant for Pearson's arrest listed crimes that Holmes, the real "Six," was believed to have committed. Based on their past activities, "Six," "Troop," and "Turbo" were "definitely considered to be armed and dangerous." J.A. 91.

Because of the risk that the men could present to officers who were unaware of their backgrounds, in late 1999 or early 2000 SLED agents put together a packet on the men for distribution to local police departments to inform local officers that these men were armed and possibly dangerous and to aid in their identification. The packet

focused on the three men for whom SLED believed they knew real identities ("Six," "Troop," and "Turbo"), but also advised that there were others in their gang whom the informants could not identify. The packet included outstanding warrants, criminal histories, street names, and pictures, of all three men, and cautioned that when approached, the men might be armed and dangerous. Holmes was not named in the packet.

In addition to distributing the packet, SLED agents also discussed the robberies, in person, with local departments, including the Myrtle Beach police department. During these discussions, SLED agents not only verbally related the information already in the packet, but also related the additional facts that the men were known to travel in a green Lincoln Navigator and, when in Myrtle Beach, were known to associate with Timothy Gadsen — a local drug dealer who "liked to carry guns [and was] known to be bad." J.A. 56.

### B.

The first of Holmes' two felon-in-possession convictions stemmed from the events of January 21, 2000. On that date, a confidential informant told Myrtle Beach police that "Six," "Troop," and "Gadsen" had arrived at a local apartment complex in a dark-green Navigator. Officer Starr of the Myrtle Beach police had received reliable information from this informant in the past, and SLED Agent Knowles also credited the informant's tip because of the connection between Gadsen and the gang.

Local and state officers in the area conferred and decided to set up surveillance of the apartment, which soon corroborated the Navigator's presence. The officers wanted to try to execute the arrest warrants for Pearson and Pressly (*i.e.*, "Six" and "Troop," respectively) but, believing that an arrest at the apartment complex would be too dangerous, decided to stop them in the Navigator once the men chose to leave. Hours later (around 10:00 p.m.), officers finally observed two men (later discovered to be Holmes and Nathan Singleton) take off in the Navigator. But because it was "pretty dark" outside, the officers could not make out individual faces. J.A. 87. The darkness also prevented the officers from seeing that a third person, Gadsen, had also left in the Navigator. Officers followed the car to the Jet Age

Café, a local nightclub, where the two men briefly went inside. Again, the officers did not see Gadsen exit the Navigator.

Holmes and Singleton eventually left the caf), leaving (unbeknownst to the officers) Gadsen behind, and drove away in the Navigator. Five or six police cruisers followed and, shortly thereafter, stopped the SUV. When confronting the SUV and its occupants, the officers used "felony stop" tactics, which are designed to protect the officers and the public in situations where officers believe that a vehicle's passengers may be armed and dangerous. Following these tactics, Corporal Hull first ordered the vehicle's occupants to throw the car keys out the window and to exit the vehicle through the driver's side doors. After Holmes and Singleton stepped out, Hull then directed them to back away, one after the other, from the vehicle with their hands above their heads. Eventually, the two men were handcuffed behind their backs, frisked, and secured in caged, locked patrol cars, at least twenty feet away from the Navigator.

As soon as the suspects were secured, officers approached the Navigator to determine whether there were any weapons or other persons hidden inside. Officer Starr conducted a protective search of the Navigator's passenger compartment, during which he found a "rare" 9mm Daewoo pistol in the center console and corresponding ammunition in the glove compartment, both of which he seized. The search was completed no more than two minutes after the suspects were placed in the cruiser.

After discovering this evidence, the officers obtained the suspects' identification, which they then checked through the National Crime Information Center ("NCIC"). It is unclear how long the identification process took in this case, but testimony at the suppression hearing established that such searches normally take 5-15 minutes to complete. Eventually, the officers concluded that neither Pearson nor Pressly was among the suspects in custody, whom the officers confirmed were actually Holmes and Singleton.

The NCIC check failed to turn up any outstanding arrest warrants for either man, but did indicate that Holmes was a prior felon. While Singleton was released, the officers arrested Holmes for unlawfully possessing the Daewoo.

The second of Holmes' convictions was based on the events of July 10, 2001, after an officer noticed Holmes sitting in his Navigator in front of a convenience store, and attempted to arrest him. After a short chase, Holmes abandoned the Navigator and fled on foot. The Navigator was impounded and, days later during an inventory search of the vehicle, police found a stolen Keltec 9mm pistol under the driver's seat.

## C.

Prior to trial, Holmes moved to suppress the evidence seized during the January 2000 encounter as the product of an illegal search. The district court held a hearing on the motion in which it heard extensive testimony from several of the officers involved in that encounter, but ultimately denied the motion. The case then went to trial, where the jury convicted Holmes on both counts. As a career offender with at least three convictions for violent felonies or serious drug offenses, Holmes was sentenced to 260 months in prison.

## II.

In reviewing Holmes' challenge to the district court's denial of his motion to suppress, we "review[ ] questions of law *de novo* and findings of [historical] fact and reasonable inferences drawn from those findings for clear error." *United States* v. *Hill*, 322 F.3d 301, 304 (4th Cir. 2003) (citation omitted). Absent clear error, and to the extent consistent with the district court's findings and credibility determinations, we construe the evidence adduced at the suppression hearing in the light most favorable to the government. *See United States* v. *Perkins*, 363 F.3d 317, 320 (4th Cir. 2004). As explained below, the district court did not err in denying the motion to suppress.[1]

---

[1]Holmes also claims that the district court improperly admitted evidence of prior bad acts for which he had not been charged, in contravention of Federal Rule of Evidence 404(b). Over Holmes' objection, the district court admitted evidence that Holmes had used a Daewoo or an unknown pistol in several past robberies, which tended to rebut Holmes' contention that he did not *knowingly* possess either pistol that was found by the police. The court appeared to conclude that this evidence was "intrinsic" to the charged offenses, and thus was not subject to Rule 404(b).

A.

The primary basis for the district court's ruling was its finding that the officers who were present during the January 2000 protective search of Holmes' SUV possessed a reasonable belief that Holmes and his passenger may have been dangerous and could have "gained immediate control of the weapons" inside the Navigator, within the intendment of *Michigan* v. *Long*, 463 U.S. 1032 (1983). *See id.* at 1049. The court supported that conclusion with specific findings regarding the facts that "one of the officers who stopped [Holmes] and his vehicle and subsequently" searched it "would believe existed at the time and place in question." J.A. 112.

Those findings, and where specific findings are lacking, the relevant testimony from the suppression hearing, show the following. Based on the tip from the confidential informant, the officers reasonably believed that "Six" was in the Navigator when it was stopped that night. But because of the erroneous information in the SLED report and warrants, the officers on the scene incorrectly thought that "Six" was Pearson, not Holmes, and thus reasonably believed that Pearson was in the Navigator. Despite this "obvious" case of "mistaken identity," the officers were well aware of Pearson's (in reality Holmes') outstanding warrants for armed robbery, malicious injury, and first degree burglary. J.A. 112. Moreover, the officers did not merely know of the "specifics" of the crimes for which Pearson's arrest was sought, but also knew from their talks with SLED agents that "Six" was a known member of a gang that robbed drug dealers — persons who, the court explicitly noted, often handle large amounts of money and are themselves armed and dangerous — at gunpoint, and that the gang members were using drugs themselves. The officers also were aware that the gang's robberies included home invasions in which the men would often beat, and on multiple occasions even shoot at, their victims. And the officers knew that the gang had been involved in "other crimes of violence" as well. J.A. 113.

---

We have considered Holmes' contention, but conclude that the district court did not commit reversible error. *See United States* v. *Chin*, 83 F.3d 83, 87 (4th Cir. 1996); *United States* v. *Rock*, 282 F.3d 548, 551 (8th Cir. 2002).

Given the facts of which the officers were aware, the district court concluded that the officers "should have believed that there was someone in that vehicle who was armed and dangerous, someone who likely had weapons and likely would use those weapons in a violent way if they were confronted." J.A. 113. Moreover, the officers reasonably believed that search of the Navigator was necessary to prevent the detainees — or any other persons hidden in the Navigator — from gaining control of a weapon in the SUV's passenger compartment. While recognizing the suspects' conditions of confinement at the time of the search, the district court noted that Singleton was not arrested, and had the Navigator not been searched when it was, he could have retrieved a weapon from within after he was released. Accordingly, the court concluded that, "under the facts found to exist in this case," the protective search of the Navigator was permissible. J.A. 112-16.

B.

While it is often stated that warrantless searches are presumptively unreasonable under the Fourth Amendment, the Supreme Court has delineated several well-established exceptions to that principle. Among the most important of these exceptions, at least from the perspective of law-enforcement-officer safety, is the "stop and frisk" doctrine first enunciated by the Supreme Court in *Terry* v. *Ohio*, 392 U.S. 1 (1968). There, the Court "held that a police officer needs neither probable cause nor a warrant to conduct a brief investigatory stop of an individual if he has a reasonable suspicion that 'criminal activity may be afoot.'" *United States* v. *Brown*, 334 F.3d 1161, 1164 (D.C. Cir. 2003) (quoting *Terry*, 392 U.S. at 30). Moreover, if the officer has a "reasonable fear for his own and others' safety" based on an articulable suspicion that the suspect may be "armed and presently dangerous," the officer may conduct a protective search of, *i.e.*, frisk, the outer layers of the suspect's clothing for weapons. *Terry*, 392 U.S. at 30-31.

In several cases that find particular relevance here, the Court has built upon *Terry*'s principles, extending them to protective searches in other contexts, in light of "the paramount interest in officer safety and the extraordinary risks to which law enforcement officials are exposed during [investigatory, or *Terry*,] detentions." *United States* v.

*Stanfield*, 109 F.3d 976, 979-80 (4th Cir. 1997) (tracing the development of the Supreme Court's protective search cases).

In 1969, the Court — "relying explicitly on *Terry*" and "expressly recogniz[ing] that suspects may injure police officers and others by virtue of their access to weapons, even though they might not themselves be armed," *Long*, 463 U.S. at 1048, held in *Chimel* v. *California*, 395 U.S. 752, that the reasonable scope of a search incident to a lawful arrest extends beyond the arrestee's person to include "the area 'within his immediate control' — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763.

Little more than a decade later in *New York* v. *Belton*, 453 U.S. 454 (1981), however, the Court felt compelled to address the difficulties inherent in applying *Chimel* when vehicles are involved, noting that lower courts "ha[d] found no workable definition of 'the area within the immediate control of the arrestee' when that area arguably includes the interior of an automobile and the arrestee is its recent occupant." *Id.* at 460. Accordingly, *Belton* held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* (citations omitted).

Some lower courts had interpreted *Belton* to require that the arrestee have been inside the vehicle at the beginning of his encounter with law enforcement. The Court, however, recently held that it is immaterial under *Belton* whether the arrestee "was inside or outside the car at the moment that the officer first initiated contact with him"; *Belton* allows for area searches incident to the lawful arrest of a vehicle's "occupants" and "recent occupants" alike. *Thornton* v. *United States*, 124 S. Ct. 2127, 2131-32 (2004), *aff'g* 325 F.3d 189 (4th Cir. 2003).

And in *Michigan* v. *Long*, 463 U.S. 1032 (1983) — the case most directly relevant to the issue before us today — the Court, two years after *Belton*, applied *Terry*'s principles, in light of *Chimel* and *Belton*, to address the special "hazards involved in a roadside encounter with a suspect" who the officer has reason to believe may be armed and dangerous. *See United States* v. *Baker*, 78 F.3d 135, 137 (4th Cir.

1996) (quoting *Long*, 463 U.S. at 1049). The *Long* Court concluded that "*Terry* need not be read as restricting the preventative search to the person of the detained suspect," and it extended such searches to the area within which a suspect "would *generally* have immediate control, and that *could* contain a weapon." *Long*, 463 U.S. at 1047, 1049-50 (emphases added). More specifically, the Court held that a police officer may conduct a protective search of the passenger compartment of a lawfully stopped automobile where the "officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that [a] suspect is dangerous *and the suspect may gain immediate control of weapons*" within the vehicle. *Id.* at 1049-50 (quoting *Terry*, 392 U.S. at 21) (emphasis added).

In so holding, the *Long* Court rejected the argument that an officer has no reasonable basis for believing that a suspect may gain control of a weapon in his vehicle when the suspect is outside of the vehicle and under an officer's "brief control." The Court reasoned that the suspect (1) could "break away" from the officer and reenter the car, (2) could be allowed to reenter the car before the *Terry* stop ended, or (3) if not arrested, could lawfully reenter his car at the conclusion of the stop and gain access to any weapons inside while the police are still nearby. *See id.* at 1051-52.

## C.

As an initial matter, we note that Holmes does not seriously dispute the constitutionality of the investigatory stop of his vehicle, the procedures used to determine his identity, or the use of felony stop procedures in forcing him from the vehicle. Nor could he.[2] And though

---

[2]As to the first two issues, the officers had more than sufficient reason to think that Pressly and Pearson had arrived at the apartment in a SUV fitting the description of that in which the gang was known to travel. Indeed, Holmes was driving that same SUV when he was stopped by the police. In light of those and other facts, the police were well within their rights in executing a *Terry* stop of the Navigator to explore their suspicion that one of the SUV's occupants might be Pearson or Pressly, in detaining Holmes and Singleton for time reasonably sufficient to deter-

Holmes tries to undercut the factual support for the district court's decision, his attempt is ultimately without merit. Our review of the record reveals ample support for the district court's findings of fact.[3]

---

mine whether that initial suspicion was in fact correct and, if so, to execute the warrants for those individuals' arrest. *See United States* v. *Hensley*, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion."); *id*. at 235 (Officers stopping "suspects who are reported to be armed and dangerous" are "authorized to take such steps as [are] reasonably necessary to protect their personal safety . . . during the course of the stop.").

In addition, it was reasonable under these circumstances to use "felony stop" procedures to subdue the Navigator's occupants. *See United States* v. *Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (holding that when officers reasonably suspected that a truck's occupants "had been or were engaged in drug trafficking," that the officers approached the truck with guns drawn for their protection did not constitute an unreasonable use of force such as would convert the *Terry* stop into an arrest).

[3]In particular, Holmes claims that the record does not support the district court's finding that the officers still reasonably believed that the Navigator contained the men whom the officers sought to arrest by the time the protective search commenced. While Holmes grudgingly concedes that "the original information received by law enforcement may have given law enforcement a reasonable belief they were stopping a dangerous subject," he contends that any such suspicion ended once the men exited the vehicle and turned around to face Agent Knowles. According to Holmes, "Knowles testified that, at that time, '[Knowles] knew immediately that the suspects were not the dangerous suspects law enforcement was seeking.'" Br. of Appellant at 8-9. Apparently relying on the "collective knowledge" doctrine, Holmes asserts that Knowles' knowledge is imputable to the other officers so that "law enforcement" cannot be said to have had sufficient basis to search the Navigator under *Long* when the search occurred. *See* Br. of Appellant at 8-9, 11-12 (citing *United States* v. *Rosario*, 543 F.2d 6, 8 (2d Cir. 1976).

This claim is flawed for several reasons. Contrary to Holmes' assertions, Knowles actually testified that, when the suspects turned around to face him, he knew that "*one* of our main suspects, a guy by the name of Troop or Pressly, was not located in that vehicle." J.A. 48 (emphasis

Holmes' more substantial challenge to the denial of his motion to suppress is directed against the district court's legal conclusions. Specifically, Holmes contends that, notwithstanding the court's findings, the district court erred in concluding that, at the time the Navigator's passenger compartment was searched for weapons, and given the circumstances of the case, the officers had reasonable suspicion that he and Singleton were dangerous and could gain immediate control of a weapon therein, as is required by *Long*. We evaluate each portion of this claim in turn.

We begin by assessing whether the officers' belief that Holmes and Singleton ("the suspects") were *dangerous* was reasonable. We have no doubt that it was. As the district court explained, the officers had substantial reason to believe that one of the two occupants of the Navigator was "Six," a member of a gang whose members had carried out numerous violent felonies while armed, several of which were the subject of the arrest warrants that justified the *Terry* stop of the Navigator. *See*, *e.g.*, *State* v. *Kyles*, 607 A.2d 355, 364-65 (Conn. 1992) (holding that officers had reasonable suspicion under *Terry* and *Long*

---

added). Knowles later testified that he did not see Gadsen among the men, either. But Knowles said nothing about whether either of the two detainees were "Six" or any other person in, or associated with, the gang. Moreover, whether an officer had reasonable suspicion under *Long* is an objective inquiry, tested "in light of the facts and circumstances confronting him at the time." *Maryland* v. *Macon*, 472 U.S. 463, 470-71 (1985). Here, however, there is no evidence that Knowles communicated his discovery to the officers who remained on the scene after he left to look for "Troop." His discovery therefore did little to detract from the remaining officers' reasonable belief that *Pearson* was among the Navigator's occupants.

And even if Knowles' discovery that "Troop" and Gadsen were not in the Navigator were imputed to all the officers on the scene, it would not defeat the case for their reasonable suspicion under *Long*. In particular, while the informant told the officers that he saw "Six," "Gadsen," *and* "Troop" arrive at the apartment in the Navigator, it is unclear how many other men were already there. Arguably, when only two men got out at the "felony stop," the realization that "Troop" or Gadsen was not among those men would not have precluded the officers from reasonably believing that Pearson, a/k/a "Six," still *was*.

that at least one of four occupants of a car might have been armed and dangerous, where occupants were reasonably suspected of being involved in a recent robbery in which the robber had displayed a handgun). Admittedly, that suspicion of danger dissipated after the officers discovered that the two suspects were Holmes and Singleton, not Pearson (although had the officers known that "Six" was actually Holmes, their suspicions would have remained justified). But by that point the search had already been completed, and was not retroactively invalidated by the officers' subsequent discovery. *See Illinois* v. *Wardlow*, 528 U.S. 119, 126 (2000) ("In allowing [investigatory] detentions, *Terry* accepts the risk that officers may stop innocent people.").

It was likewise reasonable for the officers to believe that the Navigator's passenger compartment might contain weapons. The gang was known to be armed and, as the district court correctly found, the reasonable belief that "Six" (and, for that matter, "Troop" or Gadsen) was in the Navigator supports a reasonable belief that there was a weapon inside the Navigator as well.

Nevertheless, Holmes asserts that the officers lacked reasonable suspicion that he and Singleton may have been dangerous because, when the officers stopped them, Holmes and Singleton were not suspected of committing a crime, and thereafter fully cooperated with police orders. While these facts are certainly *relevant* to the overall *Long* inquiry, we do not believe that they rebut the district court's ultimate conclusion in this case.[4]

Quite simply, reasonable suspicion of a suspect's dangerousness need not be based solely on activities observed by the police during or just before the relevant police encounter, but can be based on the suspect's commission of violent crimes in the past — especially when those crimes indicate a high likelihood that the suspect will be "armed and dangerous" when encountered in the future. *See*, *e.g.*, *Hensley*,

---

[4]*Cf. United States* v. *Holifield*, 956 F.2d 665, 668 (7th Cir. 1992) ("[T]he absence of weapons on the persons [of defendant and his passengers], and the fact that there was no further aggressive behavior" after the initial traffic stop "did not, as a matter of law, make continuing apprehension of danger unreasonable.").

469 U.S. at 235; *supra* at 15 n.2. And, of course, a suspect's coopera-tion with police officers during a *Terry* stop does not, by itself, extin-guish concerns that police may harbor about that suspect's dangerousness. The facts of this case are telling in this respect: given the number of police on the scene and the tactics the officers used, that Holmes and Pearson cooperated with the police is entirely unsur-prising. However, a reasonable officer in this situation — knowledge-able of the suspects' criminal history *and* that the gang to which the suspects belonged was known to be armed — would be aware of the risk that absent a protective search of the SUV, the suspects might, as the stop proceeded, seek to take advantage of a gap in the officers' vigilance. Moreover, as *Long* provided, a reasonable officer would also be concerned about the ever-present possibility of violent interac-tion when the suspects were released at the conclusion of the investi-gatory stop. *See* J.A. 70 (testimony of Officer Starr that the officers did not know at the time of the search whether the suspects would eventually be allowed to return to their vehicle, and to any weapons therein). Indeed, it would be affirmatively *un*reasonable to think that these individuals were less dangerous than the knife-wielding mari-juana user in *Long* itself.

## D.

We turn now to Holmes' more substantial contention: whether the officers had a reasonable belief that either suspect "[might] gain immediate control of weapons" within the Navigator given that, at the time of the search, Holmes and Singleton were handcuffed in the back of a locked police cruiser, with several armed officers between them and the Navigator. Holmes essentially contends that, even assuming that the officers reasonably believed in the potential dangerousness of the suspects and in the likelihood of a weapon being present in the vehicle, it nevertheless was inconceivable that the suspects could have slipped their restraints and escaped from the locked squad car. No more conceivable, is it, he contends, that, given the substantial police presence, the suspects could have traversed the twenty or more feet to the Navigator to retrieve any weapon inside without being captured or killed.[5]

---

[5]This claim is supported by the testimony of several officers on the scene. *See*, *e.g.*, J.A. 69 (agreeing on cross examination that "there's no

These facts, Holmes claims, make it unreasonable to believe that he could have "gained immediate control of weapons" inside the Navigator. *Long*, 463 U.S. at 1049. And while *Long* denied that an officer's "brief control of a *Terry* suspect *in Long's position*" precluded a conclusion that the suspect may gain immediate access to weapons in his vehicle, *id.* at 1051 (second emphasis added), any belief that Holmes could have realistically done so *in this case* was plainly unreasonable. As such, Holmes argues, not only did the *Long* rule not apply by its literal terms when Holmes' Navigator was searched, but one of that rule's core justifications was entirely absent.

The *premise* of this argument may have merit: if there is no reasonable possibility that a suspect will gain access to the interior of his car during the period of the seizure or shortly thereafter, *i.e.*, the time when he would pose a threat to the safety of law enforcement officers or others, it may be that *Long* would not permit the officers to conduct a protective search of the car.[6] However, we need not decide whether

---

way [the suspects in the cruiser] had access to that green Navigator" at the time of the search); J.A. 82 (agreeing on cross examination that, once the area was "secured" prior to the search, "that meant neither one of [the suspects] was going to have access to that Navigator"); *cf. Thornton*, 124 S. Ct. at 2134 (Scalia, J., concurring in judgment) (rejecting government's argument that, "despite being handcuffed and secured in the back of a squad car, petitioner might have escaped and retrieved a weapon or evidence from his vehicle—a theory that calls to mind Judge Goldberg's reference to the mythical arrestee 'possessed of the skill of Houdini and the strength of Hercules'") (citing *United States* v. *Frick*, 490 F.2d 666, 673 (5th Cir. 1973) (opinion concurring in part and dissenting in part)).

[6]*Long* did not clearly hold that the degree of the officers' control over the suspect during a protective search of a vehicle is irrelevant to the reasonableness of the officer's decision to conduct a *Terry* search. *See*, *e.g.*, 4 Wayne R. LaFave, *Search & Seizure* § 9.5(e), at 290-91 (3d ed. 1996) (explaining that it is "unclear" whether *Long*'s holding "encompass[es] a reasonable judgment about the suspect's ability in the particular circumstances to get into the car" or "creates a 'bright line'" rule). We have never so held in a published opinion. And although many courts appear to treat *Long* as a bright-line rule — implicitly, if not explicitly — courts are not universal in this belief. *See* 4 LaFave, *supra*, § 9.5(e), at 290 n.227, 229 (quoting *Hoag* v. *State*, 728 S.W.2d 375 (Tex. Crim. App. 1987)), which held that there was "no basis to look in car under *Long* where defendant 'surrounded by police officers with drawn weapons' at rear of car").

the Court's decision in *Long* included this caveat because, under the facts of this case, we conclude that it was well within the range of reason to believe that, after their release at the conclusion of the stop, the suspects would have access to the interior of their car. We are also confident that it was reasonable to think that the suspects' access, in combination with their inherent dangerousness, would place the officers conducting the stop in jeopardy. Thus, regardless of the extent to which the suspects were incapacitated at the time of the search, the search of the car was a reasonable measure to protect the safety of the officers conducting the stop, and, therefore, was permissible under *Long*.

In fact, the *Long* Court justified the search in that case, in part, on just this basis. Notwithstanding the defendant's contention that he was effectively under police control at the time his car was searched, the *Long* Court explained that the search was permissible under the Fourth Amendment because, "*[i]n addition* [to the possibility of a suspect's escape from the 'brief control of a police officer'] . . . he will be permitted to reenter his automobile, *and he will then have access to any weapons inside*." *Long*, 463 U.S. at 1051-52. (citations omitted) (emphases added). The natural reading of this explanation is that the possibility of the suspect's return to his vehicle at the conclusion of the *Terry* stop was an *independent* reason why the protective search in *Long* was reasonable, and thus this possibility is sufficient even if the suspect could not reasonably reach the automobile during the search itself.[7]

---

[7]In fact, that reading seems to be the *only* way that *Long* can be squared with the Court's decision to offer this "addition[al]" justification. The two other justifications the Court provided for the reasonableness of the police officer's search in that case — the possibilities that, before the "*Terry* investigation is over," the suspect may be allowed to reenter the vehicle or may escape from police control — were based on a temporary detainee's ability to return to his vehicle, whether by leave or by force, *during* the *Terry* stop. 463 U.S. at 1051-52. For it to be relevant at all under *Long*'s rule that a suspect might also return to his vehicle *after* the conclusion of a lawful *Terry* stop, it must be the case that whether "the suspect may gain immediate control of weapons" in that vehicle is not determined by the likelihood that the suspect might actually gain access to the weapon during the seizure itself, *i.e.*, when the protective search actually occurs.

The sufficiency of this independent justification forecloses Holmes' contention that *Long* requires a reasonable belief that the suspect may "gain immediate control of weapons" *at the time of the search. Id.* at 1049. The "immediate control" language of *Long* refers not to whether the searched area is within the control of the detainee at the time of the search, but rather to the permissible scope of the "area search" authorized in *Long* — *i.e.*, those portions of the vehicle's passenger compartment "where weapons could be placed or hidden." 463 U.S. at 1049. That this is so flows inescapably from the Supreme Court's conclusion that, even though the defendant in *Long* was temporarily under police control at the time of the search, the protective search was reasonable because of the possibility that the suspect would return to his vehicle and, at that time, gain control over any weapons inside.

Accordingly, we hold that where a suspect is an occupant or recent occupant of a vehicle at the initiation of a *Terry* stop, and where the police reasonably believe the suspect may be dangerous and that there may be readily-accessible weapons in his vehicle, *Long* authorizes a protective search of the vehicle for weapons, provided the police harbor a reasonable belief that the suspect may gain access to the vehicle at a time when that access would endanger the safety of the officers conducting the stop or of others nearby — including the reasonable belief that the suspect will return to the vehicle following the conclusion of the *Terry* stop. Under *Long*, therefore, the protective search of Holmes' Navigator permissibly encompassed the entire passenger compartment of that vehicle where weapons could be found, including, of course, "containers" like the center console and glove compartment. *See United States* v. *Milton*, 52 F.3d 78, 80 (4th Cir. 1995).

E.

Holmes' final contention is that the officers acted unconstitutionally in not choosing the "more reasonable" alternative of checking the detainees' identification to see whether or not one of them was Pearson or Pressly before proceeding to search the Navigator. We disagree. The officers' *unrebutted* testimony demonstrates that, in addition to their reasonable fear that other persons might be hidden inside the SUV, the officers were also concerned — and reasonably so — that the suspects might have access to guns located therein

when the *Terry* stop was over. *See* J.A. 69-70. In response to such reasonable fears during roadside encounters with dangerous suspects, we do "not require[ ] that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter," *Long*, 463 U.S. at 1051, and, where certain law enforcement tactics are themselves legitimate under the circumstances, we "hesitate to impose [reasonable alternatives] on the law enforcement community as a matter of constitutional law," *see Stanfield*, 109 F.3d at 983. The availability of a less intrusive alternative does not render unreasonable the officers' otherwise reasonable decision to search the suspects' automobile. As we have explained above, the measures taken by the officers were necessary to satisfy their reasonable fear that other dangerous persons might be hidden within the SUV[8] and, even

---

[8]The record evidence demonstrates that this fear of the officers was justified. In addition to the substantial possibility in this case that there was another armed individual in the Navigator when it was stopped, testimony at the sentencing hearing established that the officers' view into the Navigator was significantly impaired by the Navigator's windows, which although "factory-tinted," were nonetheless "very dark" — "especially the back three windows." J.A. 104-05. Holmes has provided us with no reason to discount this assessment, particularly when it accords with the description given by the vehicle's manufacturer itself. *See Lincoln.com*, *at* http://www.lincoln.com/vehicles/interior.asp?sVehi=nav (last visited June 23, 2004) (explaining under "Solar-tinted windows" tab that so-called "privacy glass" on the "the rear doors, rear quarter and liftgate windows," of the Navigator "*offers added privacy for rear passengers while making stored items less visible from outside the vehicle*.") (emphasis added); *Navigator Specifications*, 2-3, *at* http://www.lincoln.com/vehicles/interior.asp?sVehi=nav/nav_specs.pdf (last modified Nov. 10, 2003) (describing "privacy glass" as a "standard equipment" with which "all models of the Lincoln Navigator are equipped"). While the district court did not make specific findings in this respect, the court requested testimony on the condition of the Navigator's windows and expressed its concerns about the reasonable "fear" that the obscuring effect of the SUV's tinted windows could have created in these officers. *See* J.A. 100; *cf. Stanfield*, 109 F.3d at 981 ("*Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows. . . . [H]e does not know whether he is about*

more importantly, to remove any weapons within the Navigator that, if the stop did not result in both suspects' arrests, would be in the immediate control of one or both of the suspects upon their return to the vehicle. The Fourth Amendment does not compel the officers to complete the not-insubstantial process of formally verifying the detainees' identifications before undertaking these preventive steps. *See United States* v. *Johnson*, 114 F.3d 435, 440 (4th Cir. 1997) (explaining that "the determinative issue" for deciding the constitutionality of an (otherwise lawful) delayed search is "whether the time and distance between elimination of the danger and performance of the search is unreasonable"); *cf. Long*, 463 U.S. at 1052 (explaining that officers acted reasonably "in taking preventive measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter the automobile").

## CONCLUSION

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*

---

to encounter a single law-abiding citizen or to be ambushed by a car-full of armed assailants.") (emphasis in original).

Although Holmes contends that we should discount one of the testifying officers' assessment of the Navigator's windows because he only saw the vehicle at night, that night just happened to be the very one in which the Navigator was first searched. And that the officers could observe the "silhouettes" of two individuals (*i.e*, Holmes and Pearson) in the SUV, J.A. 65, does not, of course, mean that *all* of the SUV's occupants must have been in a position where their forms could be discerned by the officers.