GREGORY, Circuit Judge,
concurring in part and dissenting in part:
Today the majority further erodes the requirement that a police officer have reasonable suspicion of serious criminal activity before prolonging a traffic stop to allow a canine unit to arrive and conduct a sweep of the stopped vehicle. The majority reaches its decision despite the fact that the factors relied upon in support of the finding of reasonable suspicion, considered separately and in their totality, do not exclude a majority of innocent travelers. Because reasonable suspicion that Kevin Newland was committing a serious crime did not exist, I would affirm the ruling of the district court to exclude the evidence that resulted from the canine sweep. I respectfully dissent from the majority on this point.
I.
Because I believe that the Government’s failure to file timely certification under 18 U.S.C. § 3731, when considered in light of the relevant factors, should not result in dismissal of the Government’s appeal, I concur in Part II of the majority’s decision.
II.
Although I agree with the majority’s general account of the facts, I believe that our inquiry must focus on the events only up until the point that Newland’s stop was prolonged beyond the time necessary to complete a traffic stop. Thus, I recount the facts from the initial stop until the point I believe that the reasonable suspicion inquiry must cease.
On September 21, 2005, Maryland State Trooper First Class David McCarthy pulled over a car driven by Newland northbound on Interstate 95 (“1-95”) in Cecil County, Maryland. Once the vehicle pulled off to the right shoulder of the highway, Trooper McCarthy approached the vehicle and advised Newland that he had been stopped for speeding. Trooper McCarthy noticed that Newland had an open cellular telephone, as well as additional cellular telephones in the vehicle. For his protection, Trooper McCarthy requested that Newland close the open cellular telephone. Trooper McCarthy then requested Newland’s license and registration.
In response to Trooper McCarthy’s request, Newland provided a U.S. Virgin Islands driver’s license in the name of “Kevin Kairo.” Trooper Newland also indicated that the car was a rental vehicle and provided McCarthy with the rental agreement. When Newland handed both of these documents to Trooper McCarthy, his hands were “shaking uncontrollably.” J.A. 170. Trooper McCarthy’s initial observation about the rental agreement was that there was a different address on the agreement than Newland had given as his current address. Trooper McCarthy questioned Newland about his address, and Newland “hesitated and eventually advised” that the address on the agreement was his girlfriend’s address. J.A. 170.
*192 Trooper McCarthy did not question Newland about the license or about his destination, but returned to his patrol vehicle and radioed for backup “for ... safety” as he felt that the stop was more than “just a routine traffic stop at [that] point.” J.A. 15. One of the backup troopers that McCarthy requested was a canine handler. Trooper McCarthy made such a request because “there was certain things with my brief contact with the defendant that raised my suspicions that something other than this traffic stop, something else was occurring.” J.A. 15. When Trooper McCarthy decided to wait for the arrival of a canine unit, a procedure that the district court found was not routine in all speeding stops of drivers going 74 miles per hour on 1-95 in Cecil County, he necessarily made the decision to prolong the traffic stop beyond the time necessary to “request a driver’s license and vehicle registration, run a computer check and issue a citation.” United States v. Rusher, 966 F.2d 868, 878 (4th Cir.1992). Although Trooper McCarthy may have based his decision on his belief that Newland’s license was obviously fraudulent, that reason was rejected by the district court—a factual finding the majority does not explicitly dispute. Thus, the decision to prolong the traffic stop cannot be supported by Trooper McCarthy’s belief about the authenticity of Newland’s license; reasonable suspicion must be established through other factors.
After calling for back up, Trooper McCarthy ran a warrant check on “Kevin Kairo,” which came back negative. While writing a traffic warning for speeding, he examined the rental agreement further and noted that the car was due back to the rental agency in Silver Spring, Maryland four hours from the time of the stop. He could have finished writing the ticket at this point, after the warrant check had come back negative. The district court, however, clearly found that he delayed finishing the ticket to allow Trooper Christopher Conner and Sergeant Michael Lewis to arrive. See J.A. 146 (“So you have him turn over the driver’s license. He turns over a rental agreement because it’s a rental car. And for some reason, there’s then a delay and there’s a discussion and the next thing we’ve got, a total of three other police officers arriving and then we have a dog alert.”); id. at 158 (“For a period of time, the defendant was kept in his car. Trooper McCarthy waited for further backup. Ultimately, the record reflects and the Court finds that Sergeant Lewis arrived, another police officer arrived and the fourth police officer ... arrived.”); id. (“With respect to the vehicle registration that was provided, running a computer check that was done in terms of a warrant check. There was clearly time to issue a citation. There was simply no reasonable suspicion of a serious crime.”). Accordingly, I believe that we must find reasonable suspicion through the factors adduced by Trooper McCarthy prior to the arrival of Trooper Conner and Sergeant Lewis if we are to uphold the canine sweep. The conversation between Trooper Conner and Newland, during which Newland discussed his travel plans, cannot be considered as part of the inquiry because it occurred after Trooper McCarthy prolonged the traffic stop beyond the time allowed by Rusher.
III.
Although we review the existence vel non of reasonable suspicion de novo, we give deference to the factual findings of the district court and, importantly, to the inferences drawn from those facts. See United States v. Arvizu, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). In addition, we review the facts in the light most favorable to Newland, as the prevailing party in the suppression hearing. See *193 United States v. Holmes, 376 F.3d 270, 273 (4th Cir.2004).
A.
In detailing the reasonable suspicion factors, the majority begins by taking judicial notice that 1-95 is a major thoroughfare for narcotics trafficking. I believe that such a fact is inappropriate for recognition through judicial notice; whether 1-95 is a major drug trafficking route is a fact subject to reasonable dispute. See Fed. R.Evid. 201(b). 1-95 is an interstate highway that runs between Houlton, Maine, and Miami, Florida, for a distance of approximately two thousand miles. There is no doubt that narcotics are trafficked on I-95; given its status as a major north-south thoroughfare running the length of the eastern seaboard, it would be stunning if narcotics were not among the varied cargoes contained within vehicles traveling on the highway. The exact magnitude of drug trafficking on 1-95 in Cecil County, Maryland, where Trooper McCarthy stopped Newland, is more complex, however, than acknowledged by the majority’s sweeping statement that 1-95 is a major thoroughfare for narcotics trafficking.
Since January 1995, pursuant to a court order, the Maryland State Police (“MSP”) have been required to keep data on traffic stops.[1] See Samuel R. Gross & Katherine Y. Barnes, Road Work: Racial Profiling and Drug Interdiction on the Highway, 101 Mich. L.Rev. 651, 658 (2002) (noting that the MSP must keep stop data pursuant to settlement in Wilkins v. Md. State Police, No. CCB-93-468 (D.Md.1993)). From 1995 through June 2000, MSP data indicate that the MSP made a total of 8,027 vehicle searches. See id. Of these, 2,146—or roughly one quarter—were made in the 1-95 corridor, the 48.5 mile stretch of 1-95 running from Baltimore to the Delaware state line, a stretch that includes Cecil County. See id. at 662. In 33.4% of the searches—one out of every three—during this period, police found narcotics in the vehicle. Id. at 668 tbl. 6. On the 1-95 corridor, narcotics were found in 37.3% of all searches, while elsewhere in Maryland, narcotics were found in 32% of searches. Id.
At the outset, successful searches on I-95 resulted in seizures of greater quantities of drugs than searches elsewhere in Maryland. See id. at 697 tbl. 12. This is not surprising; even if 1-95 were not a drug corridor, it is a major interstate highway. One would expect seizures on a major interstate to be greater than those on local roads. Of greater relevance to this case is the difference in positive search rates of cars traveling northbound on 1-95 versus those traveling south. Overall, there were approximately twice as many searches performed of vehicles traveling southbound on 1-95 than those traveling northbound. See id. at 701 tbl. 15. Drugs were found in 41.5% of all searches on southbound vehicles and 23.5% of all searches on southbound vehicles revealed drugs in a quantity that would be consistent with a charge of intent to distribute narcotics. See id. Contrariwise, drugs were found in 32.7% of all northbound vehicles searched, only .7% greater than *194 the percent of vehicles searched not on the 1-95 corridor that resulted in the discovery of drugs. In only 4.3% of searches of northbound vehicles were a quantity of drugs found at the intent-to-distribute level. Again, these percentages are more consistent with vehicle searches outside of the corridor, where 3.4% of searches were of intent-to-distribute quantities. See id. at 697 tbl. 12. The authors of the study analyzing the MSP data conclude that in the hunt for drugs on the corridor, “most of the big trophies were bagged flying south.” Id. at 697. Thus, it is southbound travel on the 1-95 corridor which results in drug seizures far and above locations in the rest of the state. Northbound travelers appear to traffic in narcotics at a rate that is generally equal to drivers on other Maryland roads. Cf. United States v. Stewart-Poppelsdorf 120 Fed.Appx. 230, 233 (10th Cir.2004) (considering, during reasonable suspicion inquiry, direction that car was traveling on known drug route).
Statistics are not inherently reliable, and the MSP data presented above are no exception. See Gross & Barnes at 678-87 (discussing potential errors and biases in the MSP data set). Nevertheless, I present the data for two reasons: First, the existence of data on the issue of drug trafficking on the specific, relevant portion of 1-95 northbound, collected by the law enforcement agency that conducted the traffic stop at issue in the instant case, demonstrates the inappropriateness of taking judicial notice of such a fact.[2] Second, the statistics indicate the possibility that while traffic stops of travelers southbound on the 1-95 corridor may result in an abnormally high percentage of drug seizures, northbound travelers such as New-land are statistically as likely to be trafficking narcotics as any other driver on any other Maryland road.
In the attempt to bolster its decision to take judicial notice of 1-95’s status as a drug corridor, the majority mischaracterizes the record and previous decisions of this Court. The majority cites Trooper McCarthy’s testimony that he is assigned to a team that identifies possible “terrorists, drug traffickers, [and] gun runners” on 1-95. J.A. 37. The fact that the MSP has a drug interdiction team that works on 1-95 does not constitute an acknowledgment that 1-95 is a drug corridor. Similarly, in United States v. Raymond, 152 F.3d 309 (4th Cir.1998), the court did not make any findings about I-95’s status as a drug corridor. The sole discussion of 1-95 in Raymond concerned the existence of a division of the South Carolina Highway Patrol “whose members are trained specifically to patrol 1-95 looking for drug traf *195 ticking activity.” Id. at 311. In United States v. Brugal, 209 F.3d 353, 360 (4th Cir.2000), one of the factors supporting reasonable suspicion was that “Interstate 95 is a major drug thoroughfare,” but that factor was undisputed by the parties. Thus, it is erroneous to cite Brugal as holding that 1-95 is a major drug thoroughfare. The majority’s citation of United States v. Bodie, 983 F.2d 1058, 1992 WL 389290 (4th Cir.1992), to support the conclusion that Virginia “has acknowledged” (the import of which remains unclear to me) that 1-95 is a drug corridor is even more disingenuous. Bodie, an unpublished decision, dealt not with the status of 1-95, but with Meadow Street in the Randolph area of Richmond, characterized as “a heavy drug trafficking area.” Id. at *1. Bodie does not contain any acknowledgments by Virginia, a district court in Virginia, or this Court on I-95’s status.
Finally, by taking judicial notice of I-95’s status as a drug corridor, the majority provides Newland with a concrete ground supporting rehearing of this case. Federal Rule of Evidence 201(e) provides that “[a] party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.” In this case, New-land objected at the suppression hearing to judicial notice of the I-95-corridor issue and has thus preserved the issue on appeal. Normally, given that the issue of judicial notice and 1-95 arose during the suppression hearing, Newland should have addressed any objections in his brief. In this case, however, the Government’s opening brief omitted any mention of I-95’s status as a drug corridor from the list of the reasonable suspicion factors.[3] Accordingly, given that the majority relies on judicially noticing I-95’s status as a drug corridor and that Newland has objected to this and has not waived such objection, I believe that Rule 201(e) affords Newland a right to be heard on this issue upon rehearing of this case.
B.
In addition to improperly taking judicial notice about 1-95, the majority bolsters the reasonable suspicion inquiry by wrongfully considering Trooper McCarthy’s suspicions about Newland’s license. Despite the district court’s factual finding that Newland’s license was not obviously fraudulent, the majority concludes that this finding was not an adverse credibility finding with regard to Trooper McCarthy (and the other officers) and appears to consider Newland’s license in the reasonable suspicion inquiry. Insofar as the majority attempts to use the lack of an adverse credibility finding as support that we may consider Newland’s license in the reasonable suspicion inquiry, this conclusion is patently incorrect. The district court concluded that the license was not obviously fraudulent and excluded it from the reasonable suspicion inquiry. While we review the existence of reasonable suspicion de novo, we accept the factual findings of the district court absent clear error and give due weight to the inferences the district court drew from those facts. See United States v. Foreman, 369 F.3d 776, 782 (4th Cir.2004). The majority does not argue that the district court clearly erred in concluding that the license was not an obvious fake. Thus, our standard of review precludes Trooper McCarthy’s doubts about the authenticity of Newland’s license from the reasonable suspicion inquiry, notwithstanding the ma *196 Jonty’s attempt to reject, sub silentio, the factual findings of the district court.
rv.
Assuming, arguendo, that 1-95 is a “drug corridor,” the factors supporting reasonable suspicion are: (1) Newland was traveling on 1-95; (2) his hands were shaking uncontrollably when he produced his license and rental agreement; (3) he provided three different addresses and hesitated before explaining why he used a Maryland address on the rental agreement; (4) the car was due back in Silver Spring four hours after the stop; and (5) Trooper McCarthy noticed several cellular telephones in the vehicle. I do not believe that these factors, in their totality, exclude a majority of innocent travelers. They cannot, therefore, have given Trooper McCarthy reasonable suspicion that New-land was committing a serious crime.
A.
Although our reasonable suspicion inquiry examines the totality of the circumstances, it is necessary to discuss the individual factors relied upon by law enforcement, both to verify their existence in the case at bar and for their probative value as a link to illegal activity. See, e.g., United States v. Santos, 403 F.3d 1120, 1126-34 (10th Cir.2005) (weighing each reasonable suspicion factor individually and then the totality of the circumstances); United States v. Boyce, 351 F.3d 1102, 1108-09 (11th Cir.2003) (reviewing videotape of traffic stop to determine that defendant was not nervous and then excluding that factor from the reasonable suspicion inquiry). After such an inquiry, the factors can then be examined in their totality. See Santos, 403 F.3d at 1134 (examining totality of the circumstances after discussing factors in isolation). Although “reasonable suspicion may exist even if ‘each of the articulated factors alone is susceptible of innocent explanation,’ ” Foreman, 369 F.3d at 785 (quoting Arvizu, 534 U.S. at 277, 122 S.Ct. 744), it is “impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.” Karnes v. Skrutski, 62 F.3d 485, 496 (3d Cir.1995).
1. Travel on a known drug corridor[4]
That a traffic stop occurs on a known narcotics corridor cannot support reasonable suspicion on its own and should be given only limited weight in the reasonable suspicion inquiry as a whole. Indeed, the status of a given highway as a drug corridor is ubiquitous in Fourth Amendment jurisprudence. See, e.g., United States v. Jenson, 462 F.3d 399, 405 (5th Cir.2006) (I-20); United States v. $49,000.00 in U.S. Currency, More or Less, 208 Fed.Appx. 651, 653 (10th Cir.2006) (I-70); United States v. Blaylock, 421 F.3d 758, 763, 769 (8th Cir.2005) (I-40); United States v. Powell, 137 Fed.Appx. 701, 702, 706 (5th Cir.2005) (I-45 northbound); United States v. Vasquez, 298 F.3d 354, 355, 357 (5th Cir.2002) (per curiam) (1-35 and U.S. Highway 59); United States v. Farmer, 215 F.3d 1338, 2000 WL 639474, at *1 (10th Cir.2000) (unpublished table disposition) (U.S. Highway 54); United States v. Hernandez-Gonzales, 166 F.3d 1222, 1999 WL 41091, at *4 (10th Cir.1999) (unpub *197 lished table disposition) (I-15); United States v. Grillo, 40 F.3d 1245, 1994 WL 620795, at *2 (4th Cir.1994) (unpublished table disposition) (I-85); United States v. Pino, 855 F.2d 357, 358 (6th Cir.1988) (I-24); United States v. Aleman, No. CRIM.A 05-261, 2006 WL 91777, at *3 (E.D.La.2006) (I-12); United States v. Sugar, 322 F.Supp.2d 85, 88 (D.Mass.2004) (1-44); State v. Kenyon, 651 N.W.3d 269, 271 (S.D.2002) (I-29 from Sioux Falls to Sioux City); O’Boyle v. State, 117 P.3d 401, 411 (Wyo.2005) (1-80). Given that nearly every stretch of interstate is considered a drug corridor, the fact that a stop occurred on any such route is almost meaningless. See United States v. Wisniewski, 358 F.Supp.2d 1074, 1093 (D.Utah 2005) (“[Tjraveling on a ‘drug corridor’ cannot reasonably support a suspicion that the traveler is carrying contraband. To so hold would give law enforcement officers reasonable suspicion that every vehicle on every major—and many minor—thoroughfares throughout this country was transporting drugs.”), aff'd, 192 Fed.Appx. 749 (10th Cir.2006). Furthermore, because of courts’ willingness to designate various cities and states as “source” regions for narcotics, it is likely that most major roads in this country could be considered drug corridors. See Foreman, 369 F.3d at 795 (Gregory, J., concurring in part and dissenting in part); United States v. Beck, 140 F.3d 1129, 1138 n. 3 (8th Cir.1998) (citing cases recognizing, inter alia, Colorado, Texas, Florida, Arizona, the entire West Coast, New Jersey, New York City, Phoenix, Fort Lauderdale, Houston, Chicago, and Dallas as drug source cities or states); State v. Quirk, 842 N.E.2d 334, 343 (Ind.2006) (“[Considering the substantial number of states and cities that have been designated as sources of drugs, a motorist, in our highly mobile society, would be hard pressed not to travel either from, to, or through a drug-source jurisdiction.”).
2. Newland’s nervous behavior
Although this Court has recognized an individual’s nervousness as a factor supporting reasonable suspicion, this factor should be given only limited weight in the context of a traffic stop. See United States v. Richardson, 385 F.3d 625, 630-31 (6th Cir.2004) (“[Although nervousness has been considered in finding reasonable suspicion in conjunction with other factors, it is an unreliable indicator, especially in the context of a traffic stop. Many citizens become nervous during a traffic stop, even when they have nothing to fear.” (citations omitted)).
In this case, although Trooper McCarthy’s report mentions Newland’s hands shaking uncontrollably, there was no testimony adduced at the hearing on the motion to suppress as to the severity of this reaction compared to that of other motorists whom Trooper McCarthy had stopped or whether Newland’s nervousness dissipated throughout the length of the traffic stop. Thus, while I agree with the majority that we should not discount a law enforcement officer’s ability to ascertain nervousness through comparison to the behavior of other motorists, there is no such evidence that Newland’s nervousness was severe in comparison to other motorists. Accordingly, I would place little weight on Newland’s nervousness in the reasonable suspicion inquiry. See Santos, 403 F.3d at 1127 (“Only extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion.”); United States v. Williams, 271 F.3d 1262, 1268 (10th Cir.2001) (noting that mere nervousness is of limited significance in reasonable suspicion inquiry, but that extreme and continued ner *198 vousness is entitled to somewhat more weight).
3. The rental agreement and New-land’s addresses
The fact that Newland was driving a rental car that was due back to the rental company in Silver Spring four hours after the stop is a factor in the reasonable suspicion inquiry. This factor, however, is entitled to minimal weight because there was no testimony connecting the keeping of a rental car over the contracted length and the commission of illegal activity. Nor was there evidence about the financial consequences for Newland had he returned the car late. See, e.g., Santos, 403 F.3d at 1129 (noting lack of testimony that extending rental agreement would have resulted in defendant’s paying penalty charges above normal rental fees and that keeping car beyond rental period may “suggest that the driver’s travel plans are uncertain or about to change, but, without more, not that they are implausible”); Boyce, 351 F.3d at 1109 (noting that planning to return rental car late is not equivalent to a suspicious travel plan and is not directly indicative of criminal activity). In addition, the district court found that even if Newland planned on returning the car late, this evidence would not indicate that Newland was committing a crime. This factual inference is entitled to deference. See Aruizu, 534 U.S. at 276-77, 122 S.Ct. 744 (giving deference to district court’s determination that a reasonable officer would wonder why defendant’s children were methodically waving out back window of minivan).
Newland’s having a different residence than the ones listed on his driver’s license and the rental agreement, as well as his hesitation when asked to explain the different addresses, is relevant to the reasonable suspicion inquiry. Contrary to the majority’s characterization, however, there was nothing “conflicting” about the addresses that Newland provided to Trooper McCarthy. Although the addresses were different, Newland did not claim to live in the Virgin Islands or at his girlfriend’s house. Cf. Richardson, 385 F.3d at 631 (“[T]he allegedly conflicting explanations of their travel plans are not mutually exclusive; it is entirely plausible that the group traveled both to see a doctor and a lawyer.”). I do not dispute that the presentation of multiple addresses is relevant to the reasonable suspicion inquiry nor that such a fact, in combination with other factors, can support a finding of reasonable suspicion. The different addresses, however, did not raise questions about New-land’s authorization to operate the vehicle and thus were not as probative as those inconsistencies that would lead an officer to prolong a stop in order to verify that the vehicle was not stolen. See J.A. 147 (“There’s no indication in the records before me that there was any concern that [Newland] had stolen the car, that he didn’t have the car legitimately.” (statement of district court)); cf. Williams, 271 F.3d at 1265, 1270 (describing drug couriers’ practice of using third-party rental vehicles where defendant’s rental agreement was in another’s name); United States v. Harris, 928 F.2d 1113, 1114-15 (11th Cir.1991) (holding that defendant with restricted license stopped in rental car raised question of authorization to drive vehicle); State v. DeMarco, 263 Kan. 727, 952 P.2d 1276, 1280 (1998) (rejecting existence of reasonable suspicion in case where defendant had rental agreement indicating absent renter).
4. Multiple cellular telephones
I agree with the majority that multiple cellular telephones are not suspicious in and of themselves, but may be considered as part of the totality of the circumstances *199 in the reasonable suspicion inquiry. Unlike other communications devices that indicate communication with individuals only within a short range, and thus are particularly prevalent in drug trafficking operations, cellular telephones are commonplace in today’s society and thus their presence has only limited probative value. Cf. United States v. Maldonado, 472 F.Bd 388, 398 (5th Cir.2006) (“[TJestimony indicated that both vehicles had two-way radios typically used by drug traffickers.”); Williams, 271 F.3d at 1262 (discussing presence of two-way, short-range radio as indicating that driver intended to stay in contact with someone in close proximity to the car and the use of these devices as a common tactic of drug smuggling teams); Cresswell v. State, 564 So.2d 480, 483 (Fla.1990) (noting presence of CB radio in defendant’s car).
B.
“While law enforcement officers certainly should be permitted to rely on their experience and expertise in detecting criminal behavior, there is a point at which experience becomes only an unparticularized suspicion or hunch.” United States v. Lebrun, 261 F.3d 731, 735 (8th Cir.2001) (Tunheim, J., dissenting) (internal quotation marks omitted). In this case, I believe that the totality of the circumstances did not constitute reasonable suspicion that Newland was engaged in illegal activity. There are multiple factors supporting the existence of reasonable suspicion, but, even when evaluated together, these factors do not rise to the level of suspicion that we require because they do not serve to eliminate the majority of innocent travelers.
Unlike in Brugal and Foreman, none of the factors supporting reasonable suspicion, even when taken together, provide a basis to conclude that Newland was engaged in drug trafficking. For example, in Brugal, while the defendants were traveling on 1-95, they also exited the interstate at a “dead exit” to avoid a supposed drug checkpoint further ahead on the highway. 209 F.3d at 355. That behavior, in conjunction with inconsistent travel plans and other factors, supported a conclusion of reasonable suspicion. See id. Similarly, in Foreman, travel on a drug corridor, in conjunction with unusual travel plans and a factor directly linked to drug trafficking (the presence of multiple air fresheners hanging from a rearview mirror) created reasonable suspicion. See 369 F.3d at 784-85. In this ease, there is no factor— other than Newland’s driving on a drug corridor, which I believe is entitled to minimal weight—that links Newland with drug trafficking. Compare Richardson, 385 F.3d at 630-631 (finding lack of reasonable suspicion where defendants exhibited nervousness, gave conflicting travel plans, and one defendant moved to the driver’s seat of the car while the officer questioned another defendant), Boyce, 351 F.3d at 1108-10 (finding lack of reasonable suspicion where defendant was driving rental car on known drug corridor, told officer he planned to return car two days late, and videotape of stop did not support police officer’s contention that defendant displayed signs of nervousness), Beck, 140 F.3d at 1137 (finding lack of reasonable suspicion where defendant was driving rental car rented by third party, displayed signs of nervousness, was coming from drug source state to drug demand state, had fast food trash on floor of car, and officer did not believe defendant’s explanation for trip), and DeMarco, 952 P.2d at 1280, 1285 (finding lack of reasonable suspicion where defendants were traveling in rental vehicle, on drug corridor, and gave inconsistent travel plans and were nervous), with United States v. Bradford, 423 F.3d 1149, 1157-58 (10th Cir.2005) (finding *200 reasonable suspicion where defendant exhibited “numerous physical manifestations of fright,” gave evasive and conflicting answers to basic questions, related travel plans that defied common sense, was driving rental car that contained luggage and fast-food wrappers, and second car exhibiting “chase car” behavior was spotted during stop), Santos, 403 F.3d at 1133-34 (finding reasonable suspicion where defendant driving rental car on drug corridor displayed signs of nervousness, had inconsistent travel plans, could not answer basic questions, and wrongfully denied having criminal record), Williams, 271 F.3d at 1271 (finding reasonable suspicion where defendant exhibited extreme nervousness, had a short-range two-way radio, and was driving a rental car registered in another’s name), and Cresswell, 564 So.2d at 481 (finding reasonable suspicion where defendant was driving car registered to someone else, with Maine plates, but New York inspection sticker, on drug corridor, and where defendant exhibited signs of nervousness, the car contained a CB radio, as well as items in the backseat normally found in trunk). Taking Newland’s behaviors in conjunction, there is no concrete basis upon which to justify the elevation of those innocent factors into the existence of reasonable suspicion.
In the ordinary case, we give due weight to factual inferences drawn by local law enforcement officers. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In this case, however, there was no testimony from Trooper McCarthy that reasonable suspicion was established solely from the factors upon which we must rely on this appeal. Trooper McCarthy testified that his suspicion was based on Newland’s license—a consideration that the district court rejected. Furthermore, Trooper McCarthy’s testimony did not provide sufficient links between the factors supporting reasonable suspicion and the commission of a serious crime by Newland. For example, though Trooper McCarthy noted in his report that Newland’s hands shook when he provided his license and the rental agreement, he did not testify as to whether Newland appeared exceptionally nervous in comparison to other motorists or whether New-land’s nervousness dissipated during the course of the stop. Similarly, Trooper McCarthy did not testify about any link between cellular telephones and drug trafficking or inquire as to the consequences if Newland returned the rental car late.
On appeal, the Government has focused on establishing that Newland’s license was obviously fraudulent; it has offered no analysis as to why, accepting the factual findings of the district court, reasonable suspicion existed. Thus, neither Trooper McCarthy’s testimony, nor the Government, provide any cognizable reason why the factors discussed above, innocent in their isolation, become sufficient to support reasonable suspicion when they are taken in their entirety.
In sum, reviewing the facts in the light most favorable to Newland, as we must, I do not believe that reasonable suspicion existed. The totality of the circumstances did not support the conclusion that New-land was committing a serious crime, given that none of the factors provided a direct link to drug trafficking and there is no evidence as to why the totality of the circumstances indicated that Newland was committing a serious crime. Because the factors would not exclude a majority of innocent travelers, Trooper McCarthy wrongfully prolonged the traffic stop to allow the canine unit to arrive. I would thus affirm the district court and suppress the evidence resulting from the canine sweep of Newland’s vehicle.
*201 V.
With all due respect, the majority undermines factual findings of the district court, engages in extra-record “factfinding” that is not warranted in this instance, and ignores that the totality of the circumstances did not provide a link to serious criminal activity, in order to uphold the canine sweep of Newland’s vehicle. Viewing the facts in the light most favorable to Newland and crediting the district court’s findings of facts, as well as inferences drawn from those facts, there was no reasonable suspicion that Newland was committing a serious crime. Thus, I believe that the canine sweep was improper under our precedent and would affirm the ruling of the district court. Accordingly, I respectfully dissent.

. Statistical factfinding of this nature is generally the prerogative of the district court. In this case, however, because the majority reaches its conclusion through judicial notice, I believe that statistics collected by the Maryland State Police on the frequency of seized narcotics on 1-95 cannot be ignored. Furthermore, I believe these statistics, even given their potential inaccuracies, to be a more reasoned way of approaching the issue of whether 1-95 is a drug corridor than our taking judicial notice on the basis of broad and sometimes uncontested statements in our prior decisions, given that neither party to this appeal addressed the issue on brief or during oral argument.

. I acknowledge that this Court has "take[n] judicial notice of the fact that South America, in general, and Colombia, in particular, are major sources of the cocaine sold and used in the United States.” United States v. Munoz, 974 F.2d 493, 495 (4th Cir.1992). While I believe that Munoz should have sought to support such a conclusion with verifiable evidence, the conclusion accorded with then-available statistics. See, e.g., Drug Enforcement Agency, U.S. Dep’t of Justice, The South American Cocaine Trade: An "Industry” in Transition (1996), http://purl.access. gpo. gov/GPO/LPS65912 (noting that in 1995, major Colombian drug trafficking groups distributed most of the world’s cocaine, made from cocaine base produced in Colombia, Bolivia, and Peru). In this case, however, the blanket statement of 1-95 as a drug corridor does not fully accord with the statistics gathered by the MSP. Thus, I find Munoz’s resort to judicial notice distinguishable from the majority’s. Similarly, situations in which courts take judicial notice of a specific neighborhood or area as a high crime area are readily distinguishable from the majority's blanket assertion about a two-thousand mile long highway. Cf. United States v. Evans, 994 F.2d 317, 322 n. 1 (7th Cir.1993) (holding that trial court did not commit plain error in taking judicial notice that alleged crime took place in high-crime area).

. The Government’s list of factors supporting reasonable suspicion included the fact that drug traffickers frequently produce false identification when stopped on 1-95, but no claim that 1-95 is a drug corridor.

. Despite my disagreement with the majority’s taking judicial notice of I-95’s status as a major narcotics trafficking corridor and the Government’s failure to include the same as a factor supporting reasonable suspicion on brief to this Court, I include this factor in the reasonable suspicion inquiry because I believe that even with its inclusion, reasonable suspicion did not exist.