F I L E D
United States Court of Appeals
Tenth Circuit

APR 6 2005

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

THOMAS RAYMOND SANTOS,

Defendant-Appellant.

No. 03-8059

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 03-CR-0033-B)

---

James H. Barrett, Assistant Federal Defender (Michael G. Katz, Federal Public
Defender, with him on the briefs), Cheyenne, Wyoming for Appellant.

Darrell L. Fun, Assistant United States Attorney (Matthew H. Mead, United
States Attorney, with him on the brief), Cheyenne, Wyoming, for Appellee.

---

Before **HARTZ** , **McCONNELL** , and **McWILLIAMS** , Circuit Judges.

---

**McCONNELL** , Circuit Judge.

---

This case involves a routine traffic stop with the all-too-routine

denouement, a drug conviction. But it has some troubling features: seeming

reliance on the defendant's selective refusal of consent as a basis for reasonable

suspicion, apparent inconsistencies between the district court's findings of fact based on the officer's testimony and the video tape of the traffic stop, and relatively weak indicators of suspicious behavior. Nonetheless, doing our best to apply the standards currently prescribed by the Supreme Court, we **AFFIRM** .

## I. FACTS

On January 13, 2003, Wyoming Highway Patrol Trooper Ben Peech observed a white Lincoln Town Car driving eastbound, and clocked its speed at eighty-two miles per hour. [1] Trooper Peech initiated a traffic stop and informed Defendant Thomas Raymond Santos, the vehicle's driver, that he had been stopped for driving eighty-two miles per hour in a seventy-five mile per hour zone. Trooper Peech asked for Mr. Santos's license and registration and noticed, while Mr. Santos collected the documents and handed them to him, that Mr. Santos's hand was visibly shaking. At that time Trooper Peech also observed that the car had California plates, that there was a cell phone in the ashtray, and that the car was clean and uncluttered. The car was licensed to a rental agency, and when Mr. Santos produced the rental agreement, Trooper Peech observed that Mr.

---

[1]The district court's order twice indicates that Trooper Peech clocked Mr. Santos at 83 miles per hour and twice suggests that the speed was 82 miles per hour. Op. at 2, 12. No reasons for this discrepancy are given in the order; the evidence before the district court at the suppression hearing was that Trooper Peech clocked Mr. Santos at 82 miles per hour and indicated as much to Mr. Santos.

Santos's hand was again visibly shaking.

Trooper Peech asked Mr. Santos to join him in his patrol car so that he could issue a warning for the speeding violation. While issuing the warning and conducting a routine check of Mr. Santos's documents and driving status, Trooper Peech learned from the rental agreement that Mr. Santos's car had been rented January 10, 2003, in Sonoma County, California, and was due to be returned there on January 17, 2003. While completing his check and the warning, Trooper Peech began to question Mr. Santos regarding his travel plans. His suspicions were aroused both by answers he found to be evasive and by Mr. Santos's apparent nervousness:

> Defendant stated that he was going to New York City to visit his mother and move his sister out to California. Defendant said that he had last seen his mother a year ago and that his sister was recently divorced and worked for the Division of Motor Vehicles ("DMV") in New York, but that she had not yet found work in California. When Trooper Peech asked Defendant how long he would stay in New York, Defendant was very vague, stating that his job only gave him a couple of weeks. When Peech asked if he would be there for a week or so, Defendant responded, "Yeah, more or less." Peech noticed that Defendant became visibly nervous. Defendant suddenly changed topics from discussing the details of his trip to the weather, stating that he heard that it would be snowing on his return trip. Defendant also swallowed hard, licked his lips, nervously stroked the top edge of the head liner of the patrol car with his hand, and his lip was quivering.

Op. at 3. Trooper Peech was sufficiently suspicious of Mr. Santos's answers and

3

manner at this point to ask dispatch to conduct a criminal history check on Mr. Santos. Trooper Peech continued to discuss Mr. Santos's travel plans, eliciting the information that Mr. Santos would be driving back to California. Trooper Peech then explained the warning citation to Mr. Santos, returned his documents, and wished him a safe trip. Mr. Santos opened the door and continued to converse with Trooper Peech, although now on topics unrelated to his own travel plans. After Trooper Peech again wished him a safe trip, Mr. Santos left the vehicle.

A few moments later, however, when Mr. Santos had reached the front of the patrol car, Trooper Peech asked, and Mr. Santos gave, permission to ask additional questions. Trooper Peech returned to the topic of Mr. Santos's itinerary, and was informed that Mr. Santos was going to New York to visit his mother and "hopefully" to pick up his sister, that he planned to stay there three or five days, and that his sister was recently divorced and was moving to California without having found a job there. Mr. Santos was able to supply an address for his mother's brownstone house in New York, but he did not know the phone number. Mr. Santos was also uncertain what his sister's job at the DMV entailed or what the exact ages of her three young children were. Mr. Santos said that the woman he had previously referred to as his sister was actually his half-sister. Mr. Santos also indicated that he was irritated with Trooper Peech's persistent course

4

of questioning when the warning had already been issued.

At this juncture, dispatch notified Trooper Peech that Mr. Santos had a prior criminal history of several drug offenses, and Trooper Peech became "highly suspicious that the vehicle contained drugs." Op. at 5. Trooper Peech accordingly asked Mr. Santos if there were any guns, bombs, dead bodies, or body parts in the vehicle, to which Mr. Santos replied that there were not and asked if Trooper Peech wanted to check the car. When Trooper Peech asked if there were any drugs in the car, Mr. Santos said that there were not, but when asked for permission to search the car, responded indirectly with the question, "Does it look like there are dead bodies in there?" Op. at 6. When asked again for permission to search, Mr. Santos used the key fob to open the trunk automatically. Before beginning the search, Trooper Peech again asked for permission to search for drugs, and Mr. Santos asked why permission was sought. Trooper Peech informed Mr. Santos that his story was inconsistent and that he had a prior criminal history for drugs. Mr. Santos denied having any prior drug charges. Upon being asked for permission again, Mr. Santos waved his open arms at the trunk in a gesture Trooper Peech understood to mean he had permission to search the trunk.

Trooper Peech found in the trunk a Little America plastic bag, two smaller

5

bags, and a new black suitcase with a lock and a storage tag dated December 3 on it. Trooper Peech asked for, and was ultimately denied, Mr. Santos's permission to search the suitcase. Trooper Peech immediately called for a drug dog, which arrived in approximately twenty-two minutes, and alerted to the presence of drugs. A subsequent search of the suitcase revealed five plastic bags containing methamphetamine weighing approximately five pounds in total.

Mr. Santos was indicted for possessing with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). After the district court's denial of his motion to suppress the evidence of the methamphetamine, Mr. Santos entered a conditional plea of guilty pursuant to a plea agreement. Mr. Santos now appeals the denial of his motion to suppress, maintaining that Trooper Peech did not have the requisite reasonable suspicion for a police officer to detain a suspect pending the arrival of a drug dog.

## II. ANALYSIS

### A. STANDARD OF REVIEW

The Supreme Court has described appellate review of whether an officer had reasonable suspicion as "*de novo*," *Ornelas v. United States*, 517 U.S. 690, 699 (1996), which ordinarily means "[a]n appeal in which the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings." Black's Law Dictionary 94 (7th ed. 1999). As Justice

Scalia has noted, however, it is "a peculiar sort of *de novo* review." *United States v. Arvizu*, 534 U.S. 266, 278 (2002) (Scalia, J., concurring). Not only must we uphold the factual findings of a district court made in connection with a motion to suppress unless those findings are clearly erroneous, *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001) (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998)), but we must view the evidence in the light most favorable to the determination of the district court. *Id.* (citing *United States v. West*, 219 F.3d 1171, 1176 (10th Cir.2000)); *see also Ornelas*, 517 U.S. at 699 ("[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges . . . ."). Reviewing courts must also defer to the "ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996); *see also Arvizu,* 534 U.S. at 273 (reviewing courts must "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'") (*quoting United States v. Cortez*, 449 U.S. 411, 418 (1981)); *Ornelas*, 517 U.S. at 700 ("[O]ur cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists.").

7

In practice, this looks more like deference—indeed, double deference—than *de novo* review. Indeed, the Supreme Court has unanimously reversed courts of appeals for overturning district court decisions denying motions to suppress, even when every single factor identified by the officers involved as suspicious was either innocuous or susceptible of an innocent explanation. *See Arvizu* , 534 U.S. at 277 ("[u]ndoubtedly, each of these factors alone is susceptible of innocent explanation," but "[t]aken together, we believe they sufficed to form a particularized and objective basis for . . . stopping the vehicle"). With those principles in mind, we proceed to review the "totality of the circumstances" in this case to determine whether the district court was correct to hold that the Fourth Amendment was not violated.

## B. REASONABLE SUSPICION

Mr. Santos does not dispute that he was speeding when he was stopped by Trooper Peech, [2] and thus that the traffic stop was justified at its inception under objective standards. Nor does Mr. Santos dispute that the initial phase of the search, after Trooper Peech returned his documents, was conducted with his express consent. When Trooper Peech proposed to search the black suitcase in

---

[2]Mr. Santos testified, and in subsequent briefing has maintained, that his cruise control was set at 77 miles per hour when Trooper Peech pulled him over. Since it is undisputed that the applicable speed limit was 75 miles per hour, Mr. Santos was speeding by his own account. Trooper Peech testified Mr. Santos was going 82 miles per hour.

8

Mr. Santos's trunk, however, Mr. Santos said no. Trooper Peech then detained Mr. Santos while a drug dog was brought to the scene. That detention was not consensual. The question, then, is whether Trooper Peech had reasonable suspicion to justify detaining Mr. Santos at that point.

**1. Refusal of Consent**

Mr. Santos argues that it was his refusal to allow a search of his suitcase, rather than the concatenation of circumstances invoked by the trooper and accepted by the district court, that was the basis for the finding of suspicion. Regrettably, Mr. Santos's argument is not without support in the record. At the conclusion of the suppression hearing the district court commented that "I think there was a permission to search here, except he declared the suitcase out of bounds, which was in itself suspicious." R. Vol. 2 at 122. Mr. Santos's unwillingness to consent resurfaced at his sentencing hearing. The district court stated:

> I think that Officer Peach [sic] had reasonable grounds to suspect that you were carrying something you shouldn't have been, and particularly when you allow the search of every part of the car except that black bag sitting there. I think that that makes—would make any law enforcement officer reasonably suspicious. It sure would me. And I think it would anybody else.
> And I think that that is an exception to the rule—that the officer can't consider the denial of the right to search as a suspicious circumstance because in this case, it was with reference to that bag that was sitting there, and I believe that that would be an exception. So, basically, I really don't think your appeal is worth a darn.

9

R. Vol. 3 at 14-15.

The district court was wrong about this. A refusal to consent to a search cannot itself form the basis for reasonable suspicion: "it should go without saying that consideration of such a refusal would violate the Fourth Amendment." *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997); *see also United States v. Dozal*, 173 F.3d 787, 794 (10th Cir. 1999); *Hunnicutt,* 135 F.3d at 1350-51; *accord United States v. Hyppolite*, 65 F.3d 1151, 1157 (4th Cir. 1995); *United States v. Alexander*, 835 F.2d 1406,1409 n.3 (11th Cir. 1988). If refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections. A motorist who consented to a search could be searched; and a motorist who refused consent could be searched, as well. With considerable understatement, this Court has observed that the requirements of reasonable suspicion and probable cause for warrantless searches and seizures "would be considerably less effective if citizens' insistence that searches and seizures be conducted in conformity with constitutional norms could create the suspicion or cause that renders their consent unnecessary." *Hunnicutt*, 135 F.3d at 1351.

Moreover, the district court's opaque reference to an exception when the refusal is "with reference to that bag that was sitting there" is unsupported by any legal principles of which we are aware. A person has the right to limit the scope

10

of his consent. *United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003). However suspicious the tailoring of consent may be as a matter of common sense, it cannot be a basis for "reasonable suspicion" under the Fourth Amendment, lest the very idea of voluntary consent be rendered fictional.

If the district court had relied on Mr. Santos's refusal to consent in its order denying the motion to suppress, that would be reversible error. *See Williams*, 271 F.3d at 1271 (noting that the defendant's contention that the officer based his detention solely on a refusal to consent to a search, if true, "of course . . . would result in an unconstitutional search"). But that is not what happened. The district court's order denying the motion to suppress listed some nine factors that it believed, taken as a totality, supported reasonable suspicion, and Mr. Santos's refusal to consent to the search of his suitcase was not among them. The court's remarks on the consent issue occurred at the close of the suppression hearing and again during the sentencing hearing. We do not think they so infected the court's analysis of the suppression issue as to warrant per se reversal. We must, however, bear the court's remarks in mind as we consider the nine factors listed in the court's order, to make sure that the denial of the motion to suppress is objectively supportable on those grounds, without the illegitimate additional consideration of the withholding of consent. The "due weight" that an appellate court must accord the inferences drawn by the district court, *Ornelas*, 517 U.S. at

11

699, is substantially diminished when there is reason to believe those inferences were affected by an illegitimate consideration.

**2. The factors said to warrant reasonable suspicion, considered individually**

The district court listed nine factors in support of Trooper Peech's determination of reasonable suspicion warranting detention of Mr. Santos:

> (1) Defendant appeared more nervous than usual for someone pulled over for a traffic violation; (2) Defendant's nervousness increased when asked about his vacation plans and length of stay, and he suddenly changed the subject to the weather; (3) Defendant's rental agreement indicated an eight-day rental from California, when he was only as far as Wyoming on the fourth day of that rental, suggesting that he planned to turn right back after reaching New York rather than staying several days or a week; (4) Defendant gave vague, evasive, and inconsistent answers concerning his length of stay; (5) Defendant was traveling from a known drug source location (San Francisco Bay Area) to a known drug destination (New York City); (6) Defendant knew his mother's address, but not her telephone number; (8)[3] Defendant's sister had a secure job in New York but was moving to California without having a job there; (9) Defendant had a past criminal record for drug offenses, and he denied this record; and (10) the suitcase in the vehicle had a lock on it.

Op. at 14-15. We consider these in the order listed. In the final analysis, however, the question is whether, taken as a whole, they support a finding of

reasonable suspicion. *Arvizu*, 534 U.S. at 274; *United States v. Fernandez*, 18

---

[3] Number seven appears to have been omitted, so that there are only nine factors in total.

F.3d 874, 878 (10th Cir. 1994).

*a. Nervousness*

Factors (1) and (2) relate to nervousness. The district court made a factual finding that Mr. Santos "appeared more nervous than usual for someone pulled over for a traffic violation" and that his "nervousness increased when asked about his vacation plans and length of stay." Op. at 14. The indications of Mr. Santos's nervousness, as found by the district court, were changing the topic from his travel plans to the weather, swallowing hard, licking his lips, which were quivering, and nervously stroking the top edge of the head liner of the patrol car with his hand. Op. at 3.

When a motorist detained for a routine traffic violation, such as speeding, shows unusual signs of nervousness, this may be considered as part of the totality of circumstances a reasonable law enforcement officer would analyze in investigating possible crimes. *United States v. Johnson*, 364 F.3d 1185, 1192 (10th Cir. 2004). But nervousness is a sufficiently common – indeed natural – reaction to confrontation with the police that unless it is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is "'of limited significance' in determining whether reasonable suspicion exists." *Williams*, 271 F.3d at 1268 (quoting *United States v. Wald*, 216 F.3d 1222, 1227 (10th Cir. 2000)); *see Delaware v. Prouse*, 440 U.S. 648, 657

13

(1979) (noting that traffic stops "may create substantial anxiety"). Only extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion. *Williams, supra*; *see also West*, 219 F.3d at 1179; *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998).

Mr. Santos maintains that the video tape produced by the camera mounted on the patrol car "belies all of the 'observations'" related by Trooper Peech at the suppression hearing and found as facts by the district court, and "reveals an individual who is demonstrably not particularly nervous." Appellant's Br. 5 n.2. Our review of the video tape tends to corroborate Mr. Santos's assessment. While standing in front of the police cruiser Mr. Santos is seen fielding the officer's questions and answering them with little hesitation, albeit with increasing annoyance. To be sure, the two points at which the district court found the Defendant most nervous are not recorded on the video tape. The first is when Mr. Santos was initially contacted by Trooper Peech and is still sitting in the Lincoln. The second is when Mr. Santos is seated in the rear of the patrol car, where we can hear but not see him.

But our assessment of the tape is not the issue. The district court made a factual finding that Mr. Santos appeared unusually nervous, and we cannot say that finding was clearly erroneous. Those moments when the district court found Mr. Santos to be most nervous—during the initial stop and when in Trooper

14

Peech's car—were not recorded by the video camera. *Cf. United States v. Berrelleza*, 90 Fed. Appx. 361 (10th Cir. 2004) (unpublished) (crediting testimony that the canine alerted outside the view of the video tape). In addition to viewing the video tape, the district court heard the testimony of Trooper Peech and Mr. Santos, and it is in the best position to assess the credibility of that testimony.

Mr. Santos's suggestion that this Court make its own analysis of the degree of nervousness displayed on the tape asks us in effect to usurp the district court's position as finder of fact. We must reject this invitation, since the availability of some of the same evidence that was before the district court does not transform this Court into the factfinder:

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.

*Anderson v. City of Bessemer*, 470 U.S. 564, 574-75 (1985). We have had occasion to invoke this rule in another context when the fact that we had "listened to the same tape recording the trial court heard" was urged as a rationale to accord the trial court a lesser degree of deference than it is normally owed. *United States v. Little*, 60 F.3d 708, 714 n.5 (10th Cir. 1995). The increasing availability of videotapes of traffic stops due to cameras mounted on patrol cars

15

does not deprive district courts of their expertise as finders of fact, or alter our precedent to the effect that appellate courts owe deference to the factual findings of district courts. [4]

In any event, we hold that the degree of nervousness found by the district court, while not inconsequential, is insufficient to be given much weight in the reasonable suspicion calculus. In undertaking this analysis, we bear in mind that the officer (and not the court) was present at the encounter, and the officer (and not the court) has the training and experience to evaluate and compare the reactions of motorists to questioning. We therefore give Trooper Peech's assessment the "due weight" to which it is entitled under the Supreme Court's precedents. *Arvizu*, 534 U.S. at 273-74; *Ornelas*, 517 U.S. at 699. But neither Trooper Peech nor the district court described Mr. Santos's nervousness as extreme, extraordinary, or prolonged. According to Trooper Peech, Mr. Santos's hand shook visibly when handing over his license and registration early in the stop. Mr. Santos appeared to relax, however, during the first part of his interview in Trooper Peech's car, only to become increasingly nervous as the interview increased in length and the officer questioned him more pointedly about his story. For a motorist to become more nervous as the questioning becomes more

---

[4]It would, however, facilitate appellate review if district courts would make explicit the basis for their findings when those findings seem to be contradicted by, or at least not supported by, the video tape of the events.

16

prolonged and skeptical is not unnatural.  Such behavior falls short of the

"extreme nervousness [that] did not dissipate throughout the entire stop" that led

us to credit the finding of reasonable suspicion in  *Williams* .  271 F.3d at 1269.

### b. The Rental Car Agreement

The third factor listed by the district court in support of a finding of

reasonable suspicion was the comparison of Mr. Santos's rental car agreement

with his travel plans.  Mr. Santos had rented a car in California on January 10,

was in Wyoming on January 13, and proposed to drive to New York and back

despite a January 17 "due date" in his rental agreement for returning the car to

California.  As summarized by the district court:  "Defendant's rental agreement

indicated an eight-day rental from California, when he was only as far as

Wyoming on the fourth day of that rental, suggesting that he planned to turn right

back after reaching New York rather than staying several days or a week."  Op. at

14–15.

Implausible travel plans can contribute to reasonable suspicion.  *United

States v. Kopp* , 45 F.3d 1450, 1453-54 (10th Cir. 1995);  *United States v. Sanchez-

Valderuten* , 11 F.3d 985, 989 (10th Cir. 1993).  A four-day, cross-country round

trip does seem unusual, especially if the driver planned to visit with his mother in

New York, pack up his sister, and return with her to California.  But this may be

reading too much into the rental agreement.  The government presented no

17

evidence that extending the car rental period would entail any financial penalty, or even any increase in the rate. [5] Common experience suggests that it is not unusual for a driver to rent a car for a certain period, and then to extend the rental without incurring a penalty or paying a higher rate. Such an arrangement may suggest that the driver's travel plans are uncertain or subject to change, but, without more, not that they are implausible.

This case thus bears some resemblance to, but is ultimately distinguishable from *United States v. McRae*, 81 F.3d 1528 (10th Cir. 1996). In *McRae*, the defendant rented an automobile in California, with an anticipated return date of January 14. On January 12, he was stopped in southern Utah for a routine traffic violation and informed the officer he was going to New York to attend a friend's wedding. The officer asked if the defendant was going to return the car in New York, and "if he would like to be charged a late fee, that sort of thing." *Id.* at 1531. This Court observed that these travel plans were not "as implausible or contradictory" as those in the Court's precedents, but that the defendant's "evident lack of concern about how he would return the rental car displays an

_____

[5] Trooper Peech stated that it would cost Mr. Santos $90 a day for an extended rental. R. Vol. 2 at 75. This was simply the daily rate specified on the rental agreement. *See* R. Vol. 6, Exh. 1. It is not clear from the rental agreement, and nothing in the record clarifies, whether Mr. Santos would have been charged this $90 daily rate for additional days, or the reduced $67.49 the rental agreement appears to specify for days above a week's rental.

18

unusually cavalier attitude towards a financial obligation most people take quite seriously." *Id.* at 1535. The Court "conclude[d] that his vague response to Officer Colyar's inquiries concerning his rental car arrangements correctly contributed to a reasonable suspicion in a trained and experienced officer like Officer Colyar." *Id.*

The present case is distinguishable from *McRae*. In *McRae*, the Court did not find the mere fact that a driver entered a rental car agreement with an anticipated return date earlier than his probable return "implausible" or "contradictory" in itself; it was the defendant's "cavalier attitude" toward his financial obligations, reflected in his "vague responses" to the officer's direct questions, that formed the basis for reasonable suspicion. Here, by contrast, Trooper Peech noticed the return date on the rental agreement but did not discuss its implications with Mr. Santos. The district court here did not rely on the nature of Mr. Santos's "attitude" or "responses" regarding this issue in denying the motion to suppress.

We note also that in *McRae*, there was testimony that the defendant would incur—or at least thought he would incur—a "late fee" if he failed to return the vehicle two days after the traffic stop. *Id.* at 1540 n.5 (Murphy, J., concurring). There was no such testimony or evidence in this case. We decline to read *McRae* broadly, as holding that the mere existence of a rental agreement with an

anticipated return date earlier than the defendant's travel plans would make convenient, without more, supports a finding of reasonable suspicion.

### c. Vague, Evasive, and Inconsistent Answers

Three of the factors invoked by the district court related to Mr. Santos's vague, evasive, or inconsistent answers to questions about his travel plans: "(4) Defendant gave vague, evasive, and inconsistent answers concerning his length of stay; . . . (6) Defendant knew his mother's address, but not her telephone number; (8) Defendant's sister had a secure job in New York but was moving to California without having a job there." Op. at 15. The details of the conversation between Trooper Peech and Mr. Santos are set forth in the "Background" section of the district court's Order:

> Peech and Defendant conversed while the warning citation was being issued and routine driving status was being checked. Defendant stated that he was going to New York City to visit his mother and move his sister out to California. Defendant said that he had last seen his mother a year ago and that his sister was recently divorced and worked for the Division of Motor Vehicles ("DMV") in New York, but that she had not yet found work in California. When Trooper Peech asked Defendant how long he would stay in New York, Defendant was very vague, stating that his job only gave him a couple of weeks. When Peech asked if he would be there for a week or so, Defendant responded, "Yeah, more or less." Peech noticed that Defendant became visibly nervous. Defendant suddenly changed topics from discussing the details of his trip to the weather, stating that he heard that it would be snowing on his return trip. . . .

> Defendant stated that his mother owned a house in New York City and that he worked as a salesman at a Ford dealership in California. Defendant also said that New York was another two days away, and that he would be driving back to California. At approximately 3:27 p.m., Peech

20

explained the warning citation and returned Defendant's documents. Defendant stated that he would have his cruise control checked in New York. Peech said, "You have a safe trip, Mr. Santos," and Defendant opened the door to exit the patrol car. However, he then initiated another conversation with Trooper Peech about the patrol car and how some law enforcement agencies lease their vehicles. Afterwards, Peech said, "You have a safe trip, okay?" Defendant then exited the patrol car.

However, in front of the patrol car, at approximately 3:29 p.m., Trooper Peech re-initiated contact with Defendant and requested permission to ask more questions. Defendant replied, "Sure." He told Peech that he was going to New York to visit his mother. When Peech asked if he was also going to pick up his sister, he replied, "Hopefully." When Peech asked if he was going to stay in New York three to five days, Defendant responded, "Three or five days." Defendant also said that his mother owned a brownstone house in New York, and he gave an address for it, but he did not know the phone number. Defendant confirmed that his sister was recently divorced and moving to California without having found a job there. When Peech asked what his sister did for DMV, Defendant replied, "Whatever they do in DMV."

Defendant said that he did not fly to New York because his sister was afraid to fly, and he had two weeks off from work. When asked what his sister's name was, Defendant said, "It is going to be Visceranos, after she changes it back to her maiden name." Defendant then indicated that his "sister" was in fact his half-sister, who was thirty-nine years old with three small children. He could not remember their ages but thought that they were three or four years old. Defendant then became irritated and asked why he was being questioned after having already received the traffic warning. Trooper Peech told him that he was just doing his job, and that it was "cop stuff."

Op. at 3–5.

We accept the district court's characterization of some of Mr. Santos's answers as "vague, evasive, and inconsistent." At first, Mr. Santos stated he would stay in New York "about a week or so," and later amended this to "three or

21

five days." At first, he called his sister his "sister," and later said she was really his "half-sister." He did not provide specifics regarding the duties his sister performed for the DMV, and said he did not know his mother's telephone number or the ages of his sister's children.

As part of the totality of the circumstances, Trooper Peech was entitled to view Mr. Santos's answers as some indication that his story about going to New York to pick up his sister was just that: a story. Confusion about details is often an indication that a story is being fabricated on the spot. Mr. Santos volunteered information about his family, but was unable to supply corroborative details ordinarily known to a family member, and he seemed to shift his ground upon close questioning. Other courts have accepted similarly evasive or inconsistent accounts of travel plans as part of the reasonable suspicion calculus. *See Weaver v. Shadoan*, 340 F.3d 398, 408 (6th Cir. 2003) ("An officer's doubt regarding expressed travel plans or the purpose of a trip can also be bolstered by a passenger's inconsistent statements."); *United States v. Johnson*, 58 F.3d 356, 357-58 (8th Cir. 1995).

We stress, however, that conversation of this sort is not sufficient, in and of itself, to warrant detaining or searching a motorist. With the benefit of hindsight – the discovery of commercial quantities of narcotics in his car – we know that Mr. Santos's story was just a cover. But the inconsistences and gaps in his story were

22

not so significant that they would arouse genuine suspicion in the absence of other indications of wrongdoing. Many modern people, even innocent ones, program important phone numbers into their telephones and no longer memorize them. It may be lamentable that an uncle would not know the ages of his nieces and nephews, but it is hardly an indication that crime is afoot. Moreover, many motorists, even innocent ones, might think it none of the trooper's business how long they were going to stay in New York, or where their sisters worked, or why their recently divorced sisters are planning to move to California, or what work they might get when they arrive.[6] The Supreme Court has repeatedly held that refusal to answer law enforcement questions cannot form the basis of reasonable suspicion. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.") (citing *INS v. Delgado*, 466 U.S. 210, 216–17 (1984); *Florida v. Royer*, 460 U.S. 491,

---

[6]Under this Court's precedents, as part of a legitimate traffic stop a law enforcement officer is permitted to ask a motorist questions about "travel plans." *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc); *see also West*, 219 F.3d at 1176 ("[Q]uestions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of a traffic stop.") (internal quotation omitted). The Supreme Court has recently held that where the detention is not "prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment." *Muehler v. Mena*, 2005 WL 645221, *5 (U.S. Mar. 22, 2005). In this case, Mr. Santos raises no issue regarding the relevance or length of the questioning.

23

498 (1983) (plurality); *Brown v. Texas*, 443 U.S. 47, 52–53 (1979)). Vague answers may sometimes be a polite way to sidestep impertinent questions. This might also explain Mr. Santos's attempt to shift the subject to the weather. We therefore do not give much independent weight to this factor. But in conjunction with other factors, it contributed to Trooper Peech's determination of reasonable suspicion.

### d. Travel Between Drug Sources and Destinations

The fifth factor invoked by the district court is that Mr. Santos "was traveling from a known drug source location (San Francisco Bay Area) to a known drug destination (New York City)." Op. at 15. Even the government acknowledges that this factor is weak. If travel between two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention. Our holding that *suspicious* travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se. *See United States v. Beck*, 140 F.3d 1129, 1138 n.3 (8th Cir. 1998) (collecting cases in which law enforcement has declared nearly every large urban area to be a drug source city), *cited in Williams*, 271 F.3d at 1270.

### e. Prior Criminal History

24

The next factor discussed by the district court is that Mr. Santos denied that he had a prior criminal record. After Mr. Santos and Trooper Peech had left the patrol car and were discussing Mr. Santos's travel plans, dispatch notified Trooper Peech that Mr. Santos had a positive criminal history for drugs. When Mr. Santos questioned Trooper Peech's reasons for asking for permission to search for drugs, Trooper Peech informed him that his story was inconsistent and that he had a prior criminal history for drugs. Mr. Santos denied having any prior drug charges.

This is the most powerful reason the district court offered for sustaining the finding of reasonable suspicion. To be sure, this Court has held that a prior criminal history is by itself insufficient to create reasonable suspicion. *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994). Even people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches. But in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus. *Id*.; *see also McRae*, 81 F.3d at 1535–36. Moreover, when the individual lies about having a criminal history, the inference of wrongdoing is all the more powerful. *See id.* at 1536 n.7 (noting that the driver's lie about his criminal history made it "very easy to conclude that [the officer had] articulable suspicion").

*f. The Locked Bag*

25

The final factor the district court considered in holding that Trooper Peech had reasonable suspicion sufficient to detain Mr. Santos was that the suitcase in which methamphetamine was subsequently discovered had a lock on it. Neither the district court nor the government has offered any case law in support of the proposition that a lock on a suitcase may be a factor creating reasonable suspicion, or any empirical support for such an inference. The government properly reminds us that officers often possess expertise permitting them to understand the criminal connotations associated with facts that may seem innocent to the untrained. *See Arvizu*, 534 U.S. at 273. Deference to law enforcement officers becomes inappropriate, however, when an officer relies on a circumstance incorrigibly free of associations with criminal activity. *See United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) ("[S]ome facts are so innocuous and 'so susceptible to varying interpretations' that they carry little or no weight.") (quoting *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996)). In light of the many wholly innocent explanations for locking a suitcase during car travel, the locked suitcase adds nothing to the calculus.

*g. The Storage Locker Tag*

The district court noted, but did not rely on, one additional fact: that Mr. Santos's suitcase had on it a storage locker tag. At the suppression hearing Trooper Peech indicated that the tag suggested drug trafficking to him because, in

26

his experience, drug distributors sometimes preserve their anonymity by placing drugs in storage lockers and then mailing the key to a courier. This inference is weakened by the length of time that had elapsed between the date on the tag and the date of the traffic stop. The storage locker tag was dated December 3; Mr. Santos's traffic stop occurred on January 13. It seems unlikely that drug couriers would allow over a month to elapse between putting the suitcase into storage and transporting it to its destination. The tag nonetheless reasonably contributed to Trooper Peech's suspicions.

### 3. The Totality of the Circumstances

Thus far, we have separately examined each of the nine factors invoked by the district court, plus an additional factor mentioned by the police officer. Some of them—Mr. Santos's nervousness and his evasive answers, for example—must be taken into consideration but do not weigh very heavily in the calculus. Some of them are pure makeweights. Only Mr. Santos's prior criminal record and denial of it are genuinely suspicious. But, as the Supreme Court has admonished, it would be legal error to employ a divide-and-conquer strategy. *Arvizu*, 534 U.S. at 274. We must consider the factors as a whole, giving due weight to the reasonable inferences of the resident district court and to Trooper Peech's expertise. *Id.* at 273; *Johnson*, 364 F.3d at 1193.

Trooper Peech was confronted by a motorist with a criminal record, who

27

denied any criminal record and immediately attempted to deflect questions about drugs by asking the trooper if he really thought there were dead bodies in the car. Mr. Santos told a story about plans to pick up his sister in New York and bring her back to California, but the story changed in minor ways and he could not provide much detail about his family; his car rental agreement was for a shorter period than his story would suggest. He was, moreover, nervous during questioning, at least when outside the view of the video tape. His locked suitcase bore a storage locker tag.

This set of facts, taken individually, might not mean much to ordinary observers. But the Supreme Court has emphasized that "reviewing courts . . . must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273, *quoting United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person." *Arvizu*, 534 U.S. at 273, *quoting Cortez*, 449 U.S. at 418. In light of that standard of review, we cannot say that Trooper Peech's suspicion that Mr. Santos was engaged in wrongdoing, informed as it was by his experience and

28

specialized training, was unreasonable.

The district court's denial of Mr. Santos's motion to suppress is accordingly **AFFIRMED**.

03-8059 - *United States v. Santos*

**HARTZ**, Circuit Judge, concurring:


I would give more weight than Judge McConnell to the rental agreement and Mr. Santos's responses regarding his travel plans, but otherwise I join his fine opinion.