FILED
**United States Court of Appeals**
**Tenth Circuit**

**February 22, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

IAN ARBEE BATARA-MOLINA,

    Defendant - Appellant.

No. 21-8079

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 1:20-CR-00179-ABJ)**

_____

Josh Lee, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

Jonathan C. Coppom, Assistant United States Attorney (L. Robert Murray, United States Attorney, with him on the briefs), Cheyenne, Wyoming, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Circuit Judge, **EBEL**, and **EID**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

Defendant-Appellant Ian Batara-Molina appeals the denial of his motion to suppress methamphetamine found in a car he was driving. This methamphetamine was discovered after Mr. Molina was stopped for speeding on his way to Sioux Falls, South Dakota. During this traffic stop, two deputies deployed a drug-sniffing dog

around the perimeter of the car and were alerted to the presence of contraband. The car was searched, and methamphetamine was found in the trunk. Mr. Molina moved to suppress this methamphetamine on the basis that his traffic stop was delayed for the dog sniff and that the deputies lacked reasonable suspicion for this delay. After the district court denied this motion, Mr. Molina pled guilty to one count of possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).

On appeal, Mr. Molina continues to argue that his traffic stop was delayed for the dog sniff and that the deputies lacked reasonable suspicion for this delay. Exercising jurisdiction under 28 U.S.C. § 1291, we find that the traffic stop was justified by reasonable suspicion, and so we AFFIRM the district court's denial of Mr. Molina's motion to suppress.

## I. BACKGROUND

### A. Factual Background

While driving through Wyoming with a female passenger, Mr. Molina was pulled over by Deputy Eric Coxbill for going 49 mph in a 45-mph zone. Deputy Coxbill approached the car from the passenger-side of the vehicle and noticed a strong odor coming from the interior—which he would later describe as either fruity, perfumy, or like a new car smell. Speaking to Mr. Molina through the passenger window, Deputy Coxbill requested Mr. Molina's license, registration, and insurance information. Mr. Molina provided his license, but explained that the car was a rental, and proceeded to look for the rental agreement on his phone.

2

While Mr. Molina was searching for the agreement, Deputy Coxbill asked where he and his female companion were headed.  Mr. Molina said they were going to South Dakota for vacation but was unable to properly pronounce the name of their destination city.  After hearing Mr. Molina say what sounded like "See Ox falls," Deputy Coxbill asked Mr. Molina whether he meant to say "Sioux Falls."  ROA at 58.  Mr. Molina confirmed that this was indeed what he meant to say.

Mr. Molina then found the rental agreement and passed his phone to Deputy Coxbill.  After reviewing the agreement, Deputy Coxbill asked Mr. Molina how long he and his companion planned to stay in South Dakota, since he had noticed that the rental car was scheduled to be returned to California in two days (September 28).  Mr. Molina said that they intended to head back on Tuesday (September 29) and would be extending the car rental accordingly.

Deputy Coxbill then returned to his patrol car to write Mr. Molina a warning.  On his way to the car, he passed Deputy Kyle Rhoades (who had arrived at the scene while Deputy Coxbill was talking to Mr. Molina).  On his way by, Deputy Coxbill mentioned to Deputy Rhoades that he had smelled a cover odor in the car.  Deputy Rhoades then followed Deputy Coxbill back to the patrol car and stood outside the car while Deputy Coxbill wrote the warning for Mr. Molina.  While writing, Deputy Coxbill filled Deputy Rhoades in on some of his observations from the stop, including Mr. Molina's fast travel plans and the fact that Deputy Coxbill had noticed a vape in the car.  When he reached the address section of the warning, Deputy Coxbill passed the warning off to Deputy Rhoades and asked him to both verify Mr.

Molina's address and have Mr. Molina roll up his car windows. Deputy Rhoades took the warning and walked to the car while Deputy Coxbill retrieved a drug-sniffing canine from the patrol car.

Deputy Rhoades approached the driver-side of the rental car and asked Mr. Molina to exit the vehicle and roll up the windows. Mr. Molina rolled up the windows and followed Deputy Rhoades out onto the street and then along the shoulder of the road to Deputy Coxbill's car. Once Mr. Molina and Deputy Rhoades were away from the rental car, Deputy Coxbill approached the car with the dog. While Deputy Coxbill and the dog circled the car, Deputy Rhoades confirmed Mr. Molina's address. Just before Deputy Rhoades finished writing the warning, the dog alerted to contraband in the car. Deputy Coxbill then proceeded to search the car, where he found roughly fourteen pounds of methamphetamine in the trunk.

## B. Procedural Background

Mr. Molina was indicted on one count of possession with intent to distribute methamphetamine. He subsequently moved to suppress the methamphetamine seized by Deputy Coxbill on the grounds that the deputies had prolonged the traffic stop in violation of the Fourth Amendment. According to Mr. Molina, the deputies were required to have reasonable suspicion to prolong the stop for the dog sniff, which they lacked. Mr. Molina thus argued that the methamphetamine must be suppressed.

The district court held a hearing on this motion, at which it heard testimony from three Government witnesses: (1) Deputy Coxbill, (2) Deputy Rhoades, and (3) Wyoming Division of Criminal Investigation Special Agent Jason Ruby. Early in his

4

testimony, Deputy Coxbill walked through the reason that he had Deputy Rhoades confirm Mr. Molina's address.  He explained that warnings and citations for motorists are tracked in a database called "Spillman," and that it is important to ensure that addresses are accurate (in case two people with the same name are pulled over).  According to Deputy Coxbill, it is very common for a driver's license to have an incorrect address on it, and so he confirms an address every time he issues a warning or citation.

In addition, Deputy Coxbill testified that he always travels with the drug dog used here, and because of this, he never needs to wait for one to arrive at the scene.  He also explained that the dog used here doubles as an apprehension dog that is trained to bite people, and so Deputy Coxbill always has people roll up their windows during the dog sniff to ensure passenger safety, since the dog is prone to sticking his head in open windows.  And, because the canine also functions as an apprehension dog, Deputy Coxbill usually starts the sniff on the passenger side of the vehicle so that Deputy Rhoades and the driver can safely get out of the way of the dog.

Deputy Coxbill then walked through his various observations during the stop that aroused his suspicions.  When he first approached the car, he noticed an "overwhelming" cover odor coming from inside the vehicle (although he was unable to identify the exact nature of the odor).  ROA at 42.  He also found it odd that Mr. Molina pronounced "Sioux Falls" as "See Ox Falls."  Id. at 58.  Moreover, he noticed that Mr. Molina's car was rented by a third-party.  Not only that, but the rental agreement stated that the car was due back in California in two days, making for a

5

very fast trip.  Although Mr. Molina explained to Deputy Coxbill that he planned to extend the trip by one day, Deputy Coxbill was aware that this was a "long drive" and thus still believed this was a suspiciously quick trip.  Id. at 46.

Deputy Coxbill also testified that he took note of the fact that Mr. Molina was coming from California, which he believed to be a source for many narcotics.  In addition, Deputy Coxbill noticed that Mr. Molina had a vape (although he did not smell any marijuana) and had limited luggage in his backseat.  Finally, Deputy Coxbill thought it was unusual that Mr. Molina and his companion had spent the previous night sleeping at a gas station rest stop.

After Deputy Coxbill's testimony concluded, Deputy Rhoades then testified about his role in the traffic stop.  He explained that, after Deputy Coxbill had passed him the warning, he walked to the driver's side of the vehicle and asked Mr. Molina to roll up his windows and exit the vehicle so that they could confirm Mr. Molina's address.  Mr. Molina rolled up his window, and then the two men walked to the side of the road so that Deputy Rhoades could finish filling out Mr. Molina's warning.  Deputy Rhoades learned that he had in fact misunderstood Mr. Molina's address from the license, and so Mr. Molina was able to clarify the correct address.  Before he was finished writing the warning, however, Deputy Coxbill approached and told him that the dog had detected something in the vehicle.

Special Agent Ruby was the last to testify.  He explained that there are various indications of narcotics trafficking that were relevant here, like the use of a third-party rental, a short stay at a location, limited luggage in a vehicle, and the fact that

an individual is traveling from the West Coast.  Special Agent Ruby also testified that Mr. Molina's trip to South Dakota and back to California would take around fifty hours of driving.

After holding this hearing, the district court denied Mr. Molina's motion to suppress.  The court reasoned that the deputies had not delayed the traffic stop in any way for the dog sniff, since the only delay involved Deputy Rhoades and Mr. Molina walking away from the vehicle to the side of the road.  According to the court, this was only done so that Deputy Rhoades could avoid standing in traffic, and Deputy Rhoades immediately finished writing the warning once they were out of the road.  Even if the stop had been delayed for the dog sniff, though, the court concluded that any delay would be supported by reasonable suspicion.  To support this suspicion, the district court pointed to the cover odor, the incorrect pronunciation of Sioux Falls, the third-party rental agreement, the imminent expiration of the rental agreement, the night spent at the gas station, the fact that Mr. Molina was traveling from California, the vape pen, and the lack of luggage in the backseat.

## II.  DISCUSSION

"A seizure for a traffic violation justifies a police investigation of that violation."  Rodriguez v. United States, 575 U.S. 348, 354 (2015).  An officer's authority to seize a vehicle's occupants ends, however, when "tasks tied to the traffic infraction are—or reasonably should have been—completed."  Id.  Even so, it is permissible for an officer to "conduct certain unrelated inquiries during the stop," but these inquiries may not delay the traffic stop unless the officer has "reasonable

7

suspicion ordinarily required to detain an individual." United States v. Frazier, 30 F.4th 1165, 1173 (10th Cir. 2022) (citing Rodriguez, 575 U.S. at 355).[1] "Even de minimis delays caused by unrelated inquiries violate the Fourth Amendment in the absence of reasonable suspicion." Id.

Here we may assume, without deciding, that Mr. Molina's traffic stop was unreasonably prolonged to assist the drug investigation because, even with that assumption, the delay was justified by the officers' reasonable suspicion that they were confronting ongoing criminal drug activity. Whether a dog sniff is supported by reasonable suspicion is an objective question "based on the totality of circumstances," which looks to whether the facts "available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." United States v. Morales, 961 F.3d 1086, 1092 (10th Cir. 2020) (cleaned up) (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996)). This "is a mixed question of law and fact that we review de novo." United States v. Salazar, 609 F.3d 1059, 1063 (10th Cir. 2010). Although this review is de novo, the findings of fact which the district court found to support reasonable suspicion are reviewed for clear error, viewing the evidence "in the light most favorable to the determination of the district court." United States v. Santos, 403 F.3d 1120, 1124 (10th Cir. 2005). Moreover, we must "defer to the 'ability of a trained law enforcement officer to

---

[1] This moment that the stop is prolonged such that reasonable suspicion was necessary is referred to as the "Rodriguez moment."

8

distinguish between innocent and suspicious actions.'" Id. (quoting United States v. McRae, 81 F.3d 1528, 1534 (10th Cir.1996)).

The district court relied upon eight facts in determining that Deputy Coxbill had reasonable suspicion: (1) the cover odor, (2) the mispronunciation of Sioux Falls, (3) the third-party rental agreement, (4) the imminent expiration of the rental agreement, (5) the night spent at the gas station, (6) the vape pen, (7) the lack of luggage in the backseat, and (8) the fact that Mr. Molina was traveling from California. We analyze each fact below and ultimately hold that the district court properly credited the cover odor, the third-party rental agreement, and the imminent expiration of the rental agreement as supporting reasonable suspicion. However, it was error for the court to rely on the remaining factors to support reasonable suspicion of ongoing criminal activity. Taking only these permissible facts into account, this case falls very close to the line, but we nonetheless conclude that reasonable suspicion is narrowly supported by the totality of the circumstances.

### 1.    The cover odor.

The first fact was the cover odor, which was permissibly factored into the suspicion analysis. It is well-established that "a strong odor may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs." United States v. Salzano, 158 F.3d 1107, 1114 (10th Cir. 1998). Although it is common for an officer to identify the nature of the cover odor, see, e.g., United States v. Ludwig, 641 F.3d 1243, 1248 (10th Cir. 2011) (trooper identified the masking smell as cologne), it is unnecessary for the purposes

9

of reasonable suspicion for the officer to identify the precise nature of the smell.  It is enough that Deputy Coxbill found the smell to be "overwhelming," since a cover odor is often an overwhelming odor which masks the smell of narcotics.  ROA at 42, 47.[2]

### 2.  Mr. Molina's pronunciation of "Sioux Falls."

The second fact was Mr. Molina's mispronunciation of Sioux Falls as "See Ox Falls."  We conclude that there is nothing suspicious about the mispronunciation of that French word by a person who didn't purport to live there.

### 3.  The third-party rental.

The third fact was the use of a third-party rental, which was properly considered suspicious.  Although the use of a rental car alone does not contribute to reasonable suspicion, Frazier, 30 F.4th at 1177, the fact that a rental was made by a third-party is consistent with the behavior of drug traffickers, see United States v. Williams, 271 F.3d 1262, 1270 (10th Cir. 2001) ("The officer knew from his training and experience that drug couriers often use third-party rental cars.").  For this reason, it was reasonable for an officer in Deputy Coxbill's position to find the use of a third-party rental here suspicious.

---

[2] It is not enough, though, for an officer merely to identify a strong smell (like an air freshener, for example).  It is critical that the smell be sufficiently "overwhelming" as to resemble a cover odor.

### 4.    The imminent expiration of the rental agreement.

The fourth fact was the imminent expiration of Mr. Molina's rental agreement, which Deputy Coxbill permissibly found to be suspicious.  To make such a long trip—only to stay at the destination for such a short amount of time—is also consistent with the behavior of a drug courier.  See United States v. Sokolow, 490 U.S. 1, 9 (1989) (" . . . surely few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July."); see also United States v. Simpson, 609 F.3d 1140, 1151 (10th Cir. 2010) (finding it suspicious that the defendant "chose to drive a long distance to spend a single night" at his destination).

In arguing otherwise, Mr. Molina cites to United States v. Santos, 403 F.3d 1120, 1129 (10th Cir. 2005).  In Santos, the defendant was pulled over in Wyoming while traveling from California to New York in a car due back in California in four days.  Id.  We concluded that this was not suspicious because the "government presented no evidence that extending the car rental period would entail any financial penalty, or even any increase in the rate," which is key because "it is not unusual for a driver to rent a car for a certain period, and then to extend the rental without incurring a penalty or paying a higher rate."  Id.  As such, it was critical to our decision in Santos that the officer did not discuss the rental agreement with the defendant, and thus did not know whether the defendant planned to extend the agreement or whether the defendant was blasé about incurring a rental extension fee.  See id.  In contrast, Deputy Coxbill did discuss the rental agreement with Mr. Molina and learned that Mr. Molina planned to extend the agreement by just one day.  This

11

was therefore not a case where an officer was unaware of the details of a possible rental extension, nor one where an officer did not see the defendant's attitude about a rental extension.  To the contrary, Deputy Coxbill was aware that, even with an extension, Mr. Molina would have at most two days in Sioux Falls (rather than one day before the extension).  This does not undermine Deputy Coxbill's belief that the trip would be suspiciously short for a supposed "vacation."  Id.; see also Sokolow, 490 U.S. at 9.[3]  Thus, this factor also supports the district court's conclusion that there was reasonable suspicion of an ongoing drug trafficking crime.

### 5.    The night at the gas station.

The fifth fact was Mr. Molina's night at the gas station.  It was erroneous for the district court to credit this as suspicious.  Courts should not deem an action reasonably suspicious if it "describe[s] a very large category of presumably innocent travelers."  Reid v. Georgia, 448 U.S. 438, 441 (1980).  As the Fifth Circuit has recognized, persons of little means are often forced to engage in cost-cutting measures when they travel long distances, to "avoid the cost of overnight stays," United States v. Madrigal, 626 F. App'x 448, 451 (5th Cir. 2015) (unpublished)—and

---

[3] Special Agent Ruby testified that the exact length of the round-trip drive is around fifty hours.  Mr. Molina is correct, however, that we "consider only those facts known" to Deputies Coxbill and Rhoades at the point they diverted from the "traffic-based mission to arrange the dog sniff."  Frazier, 30 F.4th at 1174.  Special Agent Ruby's testimony is thus irrelevant to reasonable suspicion.  Even so, it appears that Deputy Coxbill generally understood the length of the trip, even if he did not know the precise number of hours it would take.  See ROA at 46 (Deputy Coxbill testifying that it was a "long drive" from California to Sioux Falls).  Thus, the record indicates that Deputy Coxbill was aware that Mr. Molina would have around two days in Sioux Falls for this vacation, even with the rental extension.

this includes sleeping at gas stations or rest stops.  As such, courts should not treat these cost-cutting measures as suspicious, lest they conflate poverty with crime.  See Reid, 448 U.S. at 441.  It was thus erroneous for the district court to credit this fact in the suspicion analysis.

### 6.      Coming from California.

The sixth fact was that Mr. Molina came from California.  We have held that neither state citizenship nor the origination point of a trip can serve as "a permissible basis upon which to justify the detention and search of out-of-state motorists[.]" Vasquez v. Lewis, 834 F.3d 1132, 1138 (10th Cir. 2016) (state citizenship); see also United States v. Guerrero, 472 F.3d 784, 788 (10th Cir. 2007) (origination point).  At the time that Vasquez was decided, we observed that twenty-five states had permitted marijuana use either medically or recreationally, and so the reference to a "drug source state" as a justification for a search would "justify the search and seizure of the citizens of more than half of the states in our country."  Id. at 1137–38.  This rationale has only grown stronger, since even more states have legalized marijuana in some form since Vasquez was decided.[4]  It was thus impermissible for the district

---

[4] See Ala. Code §§ 20-2A-1 et seq. (2022); Ark. Const. of 1874, Amend. 98, §§ 1 et seq. (2016); Fla. Stat. §§ 381.986 et seq. (2016); Ga. Code Ann. §§ 16-12-200 et seq. (2021); La. Stat. Ann. §§ 40:1046 et seq. (2022); Mo. Const. Art. XIV, §§ 1 et seq. (2021); N.D. Cent. Code §§ 19-24.1-01 et seq. (2021); Okla. Stat. tit. 63, §§ 2-101 et seq. (2022); S.D. Codified Laws §§ 34-20G-1 et seq. (2021); Utah Code Ann. §§ 58-37-3.7 et seq. (2021); Va. Code Ann. §§ 4.1-1100 et seq. (2021); W. Va. Code §§ 16A-1-1 et seq. (2022).

court to credit Deputy Coxbill's suspicion on this basis.  Vasquez, 834 F.3d at 1137–38.

### 7.     The vape pen.

The seventh fact was the vape pen in Mr. Molina's car.  We have previously held that the presence of common items—like butane lighters or energy pills—"adds no weight to the reasonable suspicion analysis as it would be likely to find such items in the vehicle of any innocent traveler."  Simpson, 609 F.3d at 1152.   The government has described this vape pen as among the "least probative" facts and provides no evidence that this vape pen was being used for any illegal activity.  Although we make no ruling about the possible evidential value of a vape pen under different circumstances, here it was erroneous to factor Mr. Molina's vape into the suspicion analysis.  See Simpson, 609 F.3d at 1152.

### 8.     The lack of luggage in the backseat.

The eighth fact was the lack of luggage in the backseat of Mr. Molina's vehicle.  We have previously held that this fact is worth "little or no weight" if the vehicle has a trunk because "many, if not most, travelers store luggage" in the trunk.  United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997).  To this end, it is critical that Deputy Coxbill admitted that he did not ask about luggage in the trunk before the dog sniff.  Since there was no evidence that Mr. Molina did not have much luggage in his trunk as well, we do not afford the lack of luggage in Mr. Molina's backseat any weight in the suspicion analysis.  See Mendez, 118 F.3d at 1431.

### 9.    Totality of the circumstances.

The final step of the inquiry is to look at the totality of the circumstances "to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Davis, 636 F.3d 1281, 1290–91 (10th Cir. 2011) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).  After eliminating the facts that should not have been considered in the analysis, we are left with just three facts on which Officer Coxbill permissibly relied: (1) the cover odor, (2) the third-party rental, and (3) the details of the rental agreement.  The sufficiency of these facts to establish reasonable suspicion is right on the line, but because of the deference we give to an officer "to distinguish between innocent and suspicious actions," Santos, 403 F.3d at 1124, we conclude that Deputy Coxbill's suspicion to prolong Mr. Molina's traffic stop for a dog sniff was just barely supported by the totality of the circumstances.

## III.  CONCLUSION

We AFFIRM the district court's denial of Mr. Molina's motion to suppress.